**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

CURTIS RAY HOWARD,
          *Defendant-Appellant.*

No. 05-10469

D.C. No.
CR-04-00190-PMP

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
April 3, 2006—San Francisco, California

Filed May 25, 2006

Before: John T. Noonan and Jay S. Bybee, Circuit Judges,
and William W Schwarzer,* District Judge.

Opinion by Judge Bybee;
Concurrence by Judge Noonan

---

*The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

**COUNSEL**

Franny A. Forsman, Federal Public Defender, Las Vegas, Nevada, and Shari L. Kaufman, Las Vegas, Nevada, for the defendant-appellant.

Daniel G. Bogden, United States Attorney, Karyn Kenny and Christina Brown, Assistant United States Attorneys, Las Vegas, Nevada, for the plaintiff-appellee.

**OPINION**

BYBEE, Circuit Judge:

Appellant Curtis Howard appeals the district court's ruling that the search of an apartment at which he had spent the night was constitutional because he was on probation and officers had probable cause to believe that he resided there. We hold that the evidence in this case was insufficient to establish probable cause and reverse the ruling of the district court.[1]

---

[1]Howard also challenges the magistrate judge's limitations on his cross-examination of his probation officer, Robert Aquino, as an abuse of dis-

## I. BACKGROUND

Curtis Ray Howard was convicted of bank robbery in 1996. On April 14, 2003, he was placed on supervised release, and Probation Officer Robert Aquino was assigned to monitor him. Howard's release was subject to a number of conditions, including a search clause allowing the "warrantless search of his residence, person, property, and automobile" at any time to ensure that he was complying with the conditions of his supervised release and that he "not associate with any persons engaged in criminal activity . . . or convicted of a felony." Howard reported to Aquino that his current residence was at 4879 East Owens in Las Vegas.

Howard met Tammi Barner on a bus, and the two started having a relationship. On May 14, 2003, Barner met with Aquino to request permission to continue her relationship with Howard. Barner was a seven-time convicted felon, was on state probation, and was recovering from an addiction to cocaine. Since the conditions of Howard's supervised release prevented him from associating with known felons and Aquino and his supervisor determined that the relationship was not conducive to Howard's rehabilitation, he informed Barner and Howard that they would have to terminate their relationship. Howard agreed that he would terminate his relationship with Barner.

On February 3, 2004, a confidential informant ("CI") called Aquino. The CI identified himself or herself, claimed to know Howard, and told Aquino that Howard was staying at an apartment on 2221 West Bonanza and that Howard had a firearm hidden there. Tammi Barner had previously told Aquino that she lived at 2221 West Bonanza in apartment 49. However, there are well over a hundred apartments in the West

---

cretion. Because we hold that the search of the West Bonanza residence was unconstitutional, we do not reach this question.

Bonanza complex, spread over three buildings; the CI did not know in which apartment, or even in which building, the gun was hidden. The CI also stated that he or she had not seen Howard for at least two weeks, and denied having any motive to lie. Aquino drove out to investigate at eight o'clock that evening, but he did not observe Howard's car at either the East Owens or the West Bonanza residence. The CI also mentioned a local tavern where the CI claimed Howard had spent time. Aquino drove by the tavern the following day, but did not see Howard's car there. Aquino did not otherwise attempt to verify the CI's information with anyone else.

The day after he received the CI's call, Aquino returned to the 2221 West Bonanza apartment complex and spoke with Bob, a manager there. Aquino showed Bob a picture of Howard, and Bob confirmed that he had seen Howard in the complex before. He also stated that he had seen a vehicle parked in the complex that matched the description of Howard's vehicle. Manager Bob directed Aquino to speak with Curtis Sanders, the president of the complex's condominium owner's association.[2] Officer Aquino then spoke to Mr. Sanders, who confirmed that he had also seen Howard in the apartment complex. Mr. Sanders also suggested that Howard had been there visiting Tammi Barner. Aquino then spoke by phone with Jim Jacobs, the owner of Barner's condominium. Jacobs confirmed that Tammi Barner was the legal occupant of apartment 49, and that he had contact with someone who, based on Aquino's description over the phone, might have been Howard.

---

[2]It is not entirely clear from the record, but it appears that the complex at 2221 West Bonanza may have had both apartments and condominiums in it, or that the complex contained only condominiums, but that some of the condominium owners rented them out, in whole or in part, as apartments. In any event, it is clear both that Barner rented an apartment that was owned by Jim Jacobs and that the exact nature of the complex's housing units is not relevant to the disposition of this case.

Aquino was now concerned that Howard was not abiding by the terms of his supervised release, and that he might be using the West Bonanza residence, which Howard had not reported to Aquino, to engage in criminal activity. This concern was heightened by the fact that, during the course of his supervision, Aquino made ten visits to Howard at his East Owens address at early morning hours and only found him there twice. Aquino had chosen to make early morning visits because, based on his knowledge of Howard's work schedule, he concluded that this was the time at which Aquino was most likely to find Howard in his home.

Prior to receiving the tip from the CI, however, Aquino had not been concerned that Howard was living elsewhere. Aquino knew that a high percentage of his visits to his supervisees were unsuccessful, and Aquino had seen Howard at the East Owens residence on his most recent surprise visit. At that time, the residence appeared as if Howard was still living there; there were pictures on the walls and there were clothes and furniture in the house. Aquino also knew that one reason he might not have seen Howard more frequently on his surprise visits was because Howard's work schedule was subject to change, and that Howard was not obligated to report changes in his work schedule to him. Moreover, on three of Aquino's attempted visits to Howard at the East Owens residence, Aquino had spoken with one of Howard's neighbors, who confirmed that Howard was still living there. On one occasion, the neighbor told Aquino that he had just missed Howard; another time, he said that Howard was a very quiet guy.

After his visit to the West Bonanza complex, Aquino contacted local police to determine whether Howard was the subject of any investigations. Because Howard's file indicated that he was previously a member of the Bloods gang, Aquino spoke to the Las Vegas Metropolitan Police Department Gang Unit ("Gang Unit"). He also contacted the Repeat Offender Enforcement Squad. Neither group had any further investiga-

tions against Howard or information about his activities, but both groups said they would contact Aquino if they received any information implicating Howard's involvement in criminal activity. An officer with the Gang Unit later called Aquino to inform him that a reliable confidential juvenile informant had reported that Howard was a gun dealer and that he might possibly be among the leaders of the West Coast Bloods.

On February 7, 2004, the CI called Aquino again at approximately 4:30 a.m. and informed him that Howard's vehicle was at the West Bonanza address. Aquino then drove to the West Bonanza address and observed Howard's vehicle there at roughly 5:00 a.m., parked in the lot right below apartment 49.

Meanwhile, in response to the information that Aquino had received from the Gang Unit, he enlisted the help of other law enforcement to surveil Howard, both at the West Bonanza residence and at the East Owens residence. Surveillance began on February 10; as of February 20, Aquino affirmatively knew that police had not seen Howard at the West Bonanza residence. Surveillance continued for roughly two weeks, until roughly March 8; Aquino did not receive any reports from the surveilling officers stating that Howard had been observed at the West Bonanza residence at this time, but he did not know for certain whether Howard had been observed there. On March 17th, Aquino returned to the leasing office at West Bonanza to ask whether the leasing agent had seen Howard in the complex. The agent told Aquino that he had not seen Howard there in at least a week and a half.

Aquino then secured an order from the probation department to search both the West Bonanza and the East Owens residences. He arrived at the East Owens complex at 6:00 a.m. on March 30, more than seven weeks after surveillance began, but he did not see Howard's car in the parking lot. He then proceeded to the West Bonanza complex, where he observed Howard's car parked below Barner's apartment at

roughly 6:30 a.m. Aquino remained in his car and watched the West Bonanza apartment until the rest of the search team arrived, which was between 7:45 and 8:00 a.m. While Aquino watched the apartment, he saw Howard come out and stand in the doorway with no shirt on. Howard stood in the doorway and stretched for approximately ten or fifteen minutes, then returned to the apartment, shutting the door behind him.

Howard and Barner subsequently left the West Bonanza apartment and began walking in different directions. After they had separated, Aquino and another member of the search team confronted Barner, while other officers detained Howard. The officers told Barner that they were going to conduct a search of her apartment based on Howard's presence there. Barner stated that Howard did not live in the West Bonanza residence and that he did not have a key, and she refused to consent to a search of the apartment. Aquino and the other officer then brought Barner over to where Howard was being held. En route, Barner continued to insist that Howard did not live at the West Bonanza apartment, but acknowledged that he had a few personal belongings, such as some clothing, in her apartment.

Meanwhile, out of concern for officer safety, Howard had been handcuffed by other members of the search team, who had also read him his *Miranda* rights. Aquino informed Howard that the West Bonanza apartment was going to be searched. Howard admitted that he had stayed at the West Bonanza apartment before, but denied living there and told officers that he did not have a key to the apartment. After again denying officers permission to enter her apartment, a furious Barner was given permission to leave the scene, and did so. The officers took Howard's keys and attempted to use them to gain entry to the search site, but none of Howard's keys fit the lock on the West Bonanza apartment.

Jim Jacobs, the owner of Barner's apartment, then approached the officers and offered to use his keys to let them

into her apartment.[3] Aquino was also approached by another resident of the complex, who stated that she had seen Howard there "at least eighty to ninety percent of the time." Jacobs then let the officers into the apartment; they conducted a search and found a gun in a closet, wrapped in a hat. Howard acknowledged that the gun was his. The only other items belonging to Howard that were found in the West Bonanza residence were Aquino's business card, found next to an alarm clock in the bedroom, and a prescription with Howard's name on it.

After his indictment in May 2004, Howard challenged the constitutionality of the police search. He also sought to suppress the incriminating statements he made after the search (i.e., admitting the gun was his) as fruit of the poisoned tree. Following an evidentiary hearing, the magistrate entered findings and recommendations concluding that the search was constitutional and the incriminating statements were voluntary. The district court adopted these findings and recommendations. Howard subsequently entered a conditional plea of guilty to charges that he had knowingly received a stolen firearm in violation of 18 U.S.C. § 922(j) while reserving the right to appeal the validity of his probation search. Howard was sentenced to 120 months followed by a term of supervised release of three years. This appeal followed.[4]

## II.  ANALYSIS

[1] As a condition of his supervised release, Howard consented to the "warrantless search of his residence, person, property, and automobile" at any time. Officer Aquino and the other officers who searched the West Bonanza residence

---

[3]The government concedes that Jacobs did not have the power to consent to a search of the apartment.

[4]We review the denial of a motion to suppress evidence de novo. *United States v. Gorman*, 314 F.3d 1105, 1110 (9th Cir. 2002). The district court's findings of fact are reviewed for clear error. *Id.*

relied on this clause for the authority to search the residence; they did not have a search warrant, nor were there exigent circumstances. However, by its own clear and explicit language, the search clause only applies if the West Bonanza apartment was Howard's residence. "[B]efore conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched." *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc).[5] *See generally Georgia v. Randolph*, ___ U.S. ___, 126 S. Ct. 1515 (2006) (discussing and analyzing the rights of co-tenants and the Fourth Amendment implications of co-tenancy).

[2] We have applied a relatively stringent standard in determining what constitutes probable cause that a residence belongs to a person on supervised release. It is insufficient to show that the parolee may have spent the night there occasionally. Instead, the facts known to the officers at the time of the search must have been sufficient to support a belief, in "a man of reasonable caution," that Howard lived at 2221 West Bonanza. *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal quotation omitted); *Dawson v. City of Seattle*, 435 F.3d 1054, 1062 (9th Cir. 2006); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). This is a higher standard than a mere well-founded suspicion. *See United States v. Martell*, 654 F.2d 1356, 1358 (9th Cir. 1981).

---

[5]Before *Motley*, this question was a matter of some confusion in our case law. *Compare, e.g.*, *United States v. Dally*, 606 F.2d 861, 863 (9th Cir. 1979) (holding that police must have reason to believe that a residence belonged to a parolee before executing a search pursuant to a search clause), *with United States v. Harper*, 928 F.2d 894, 896 (9th Cir. 1991), (requiring that officers have probable cause to believe that the probationer lived there). *See generally United States v. Watts*, 67 F.3d 790, 795 (9th Cir. 1995) ("We need not resolve the apparent tension between *Harper*'s probable cause standard and the 'reasonableness' standard enunciated in *Dally* . . . ."), *overruled on other grounds*, 519 U.S. 148 (1997). Our en banc decision in *Motley* has conclusively settled this question: The Fourth Amendment requires probable cause in these circumstances. *See Motley*, 432 F.3d at 1080.

An examination of our case law demonstrates just how stringent this standard is. In *Dally*, officers surveilled Holiday, a parolee they were investigating, at Dally's apartment. 606 F.2d at 862. After arresting Holiday, and over Dally's vehement objections, the police searched Dally's apartment. *Id.* The government argued that the search was lawful under the search clause of Holiday's parole. However, the search clause only permitted officers to search his residence; thus, the question was whether probable cause supported the police's belief that Holiday resided at Dally's apartment.[6]

In *Dally*, the police had strong evidence to conclude that Holiday was living with Dally; for starters, a federal agent who was also investigating Holiday had told Holiday's parole officer that he was living there. 606 F.2d at 862. The police then conducted surveillance, during which they photographed Holiday taking out the trash, bringing in his laundry, and chatting with the neighbors. *Id.* Officers returned a week later to find Holiday's car parked near the house with fogged windows, indicating it had been parked overnight; Holiday left the house the next morning, driving in a different car that had also been parked there overnight. *Id.* He returned with dry cleaning, changed his clothes, and left the house again, carrying laundry. *Id.* He later returned with more dry cleaning, and officers observed him use a key to open the door. *Id.* Holiday had also failed to return a message left for him at his reported address. *Id.* We upheld the search of the residence, finding that these facts were sufficient to establish probable cause.

We were similarly stringent in *Harper*. In that case, an arrest warrant had been issued for parolee David Harper, but his parole officer did not have a current address for him and could not locate him. *Harper*, 928 F.2d at 895. A tip focused

---

[6]Technically, the Court considered whether the facts "supported a reasonable belief" that Holiday lived with Dally. *Id.* at 863. Prior to our discussion in *Motley*, we had occasionally conflated this standard with probable cause. *See Gorman*, 314 F.3d at 1115; *see also* footnote 5, *supra*.

the police's attention on 10 Manzanita, where Harper's broth-ers lived. *Id.* After some surveillance, Harper's parole officer executed the warrant by entering the 10 Manzanita residence and arresting him. *Id.* However, the warrant only authorized the police to enter the residence of David Harper; it did not authorize entry into his brothers' residence. Therefore, the arrest was lawful only if the police had probable cause to believe that he lived at 10 Manzanita. We wrote that:

> Here, the police knew that the home at 10 Manza-nita was leased to the Harper family and that Tommy and James Harper, two of David's brothers, lived there; an uncorroborated source had informed them that David lived there as well. Through intermittent surveillance, the police observed David entering the home with his own key once or twice during a three day period. The police also knew that David had lived with his family at another address immediately before he was incarcerated, suggesting that he had no independent residence and would resume living with them upon his release. In addition, the police saw cars belonging to known associates of David's parked at the Harper family home. This information was sufficient to give the police probable cause to believe that David resided there—but just barely. It would have been far more prudent for the police to have obtained a search warrant.

*Id.* at 896.

In *Watts*, officers searched the house of Sonia Lee on the basis that probationer Watts was residing in the house with her. 67 F.3d at 793. We again found that the police had proba-ble cause to believe that Watts lived with Lee, but only on very strong facts. "In weekly visits to [Watts's reported address, Watts's parole officer] had located Watts there only once in fourteen months." *Id.* at 795. On the one occasion that he found Watts there, the parole officer "looked around the

house and concluded that what was supposed to be Watts's bedroom lacked the usual signs of residency, such as clothing and personal belongings." *Id.* A "confidential reliable informant, who had provided information . . . more than a dozen times and whose tips had resulted in multiple convictions," informed officers that Watts was living with Sonja Lee. *Id.* Subsequent police surveillance confirmed both the details and the substance of the informant's tip. *Id.* The police observed Watts enter Lee's house while he was under surveillance. *Id.* "[O]fficers saw Watts go to [the address Watts had claimed as his residence], knock on the door, then leave when no one responded, strongly suggesting that Watts did not live there."[7] *Id.* Finally, Sonja Lee told the police that Watts lived in her house with her. *Id.* at 793.

In *United States v. Conway*, 122 F.3d 841 (9th Cir. 1997), the police searched a residence at 1930 West College; Conway, a probationer, had not reported this as his address. The search revealed a gun and Conway pled guilty to being a felon in possession of a firearm while reserving the right to challenge the legality of the search. On appeal, he argued that the search was not permitted by the terms of his probation because, under the facts known to them at the time, the police did not have probable cause to believe that Conway lived at the West College address.[8] We again approved the search, but only on a similarly strong fact pattern. First, there was strong evidence to suggest that Conway was not actually residing at his reported address: Conway's probation officer "had been to

---

[7]Watts also had a key to, and a garage door opener for, Lee's residence, but we explicitly did not consider this evidence in finding that probable cause existed. *Id.* at 796 n.1.

[8]The majority in Conway did not apply *Dally* or *Harper* and their progeny. For state law reasons, the majority only required a "well-founded suspicion" that Conway was residing at the residence in question. However, Judge Wallace, in his concurrence, applied *Dally*, *Harper*, and *Watts*, and concluded that probable cause supported the search. *Conway*, 122 F.3d at 844-45 (Wallace, J., concurring). We therefore include the facts of this case in the discussion.

[Conway's] reported address on 21 occasions, but had found [him] there only once." *Id.* at 842. The only possessions there that could be identified as belonging to him were a pair of socks. *Id.* at 843. The evidence tying Conway to the West College address was even more powerful:

> A confidential informant told [officer] Turcin[, Conway's parole officer,] that a man who met Conway's description and who went by the name "Arab," Conway's known street moniker, often walked his dog at night outside the 1930 West College address. Turcin discovered independently that Conway had a dog. Police observed Conway leaving the 1930 West College home at 8:45 am. When Turcin told Conway that he wanted to go to 1930 West College, Conway said that "his" dog was there and would attack anyone who entered. At the residence, Conway opened the front door with his own keys. Turcin observed mail and notes addressed to Conway; Conway identified a bedroom in the house as "his," and Turcin saw clothes in the bedroom that Conway had worn on visits to Turcin's office.

*Id.*

In *Motley*, the most recent development in this line of cases, officers were looking for a parolee at an apartment belonging to his girlfriend, and we again found that their belief that the parolee lived there was supported by probable cause.[9] 432 F.3d at 1075. " '[E]verything' was in her name" and "she paid the rent and all bills associated with the apartment," *id.*; however, her address was the most recent address

---

[9]The facts of *Motley* are sufficiently different from those presented here that it is not of much use for comparison purposes. However, since *Motley* is a very recent en banc case that considers the issue presented here, any comprehensive examination of our case law on this subject must discuss it, at least briefly.

the parolee had reported to his parole officer, *id.* at 1075-76. At the time of the search, the parolee was actually in state custody, but the officers conducting the search were not aware of this. *Id.* at 1076. When the officers knocked on the door, they were informed repeatedly by the parolee's girlfriend, who lived there with their infant son, that the parolee did not live there and that he was in state custody. *Id.* The police refused to listen and proceeded to search the residence. *Id.* We affirmed the district court, holding that the officers were entitled to rely on their knowledge of the parolee's most recent address, as reported by the parolee to his parole officer. *Id.* at 1082.

When presented with weaker facts, we have not hesitated to rule that officers could not justify a search for lack of probable cause. In *Watts v. County of Sacramento* (*Watts II*), 256 F.3d 886 (9th Cir. 2001), the police received an anonymous tip on the whereabouts of Chris Burgess, a suspected murderer for whom an arrest warrant had been issued. The police officer assigned to investigate the tip was informed that: "(1) Burgess was a black male standing [6' 1"] and weighing 200 pounds; (2) there was a warrant for Burgess's arrest on a murder charge; and (3) Burgess was possibly located at a certain address with his girlfriend and two children." *Id.* at 888. Officers went to the residence and knocked on the door, which was opened by Chris Pryor. Pryor was wearing boxer shorts and he fit Burgess's general description. *Id.* The officers asked Pryor if his name was Chris; when he said that it was, they handcuffed him and performed a protective sweep of the house. *Id.*

Pryor and his girlfriend Watts then brought suit, alleging various state torts and civil rights claims. The district court dismissed Watts's claim for illegal entry because it found that officers had probable cause to believe that Burgess was a resident of the Pryor home. *Watts v. County of Sacramento*, 65 F. Supp. 2d 1111, 1117 (E.D. Cal. 1999). We reversed. We held that the anonymous tipster's information had not been suffi-

ciently corroborated, and that "the mere fact that Pryor answered the door of his girlfriend's home in his boxer shorts did not establish a reasonable belief that he lived there." *Watts II*, 256 F.3d at 890.

**[3]** In considering the cases where this Court upheld the search of an address not reported by a parolee—i.e., *Dally*, *Harper*, *Watts*, and *Conway*—certain patterns clearly emerge.[10] First, in each of these cases, the parolee did not appear to be residing at any address other than the one searched. In three of these four cases, the parolee had reported a different address, but officers had good reason to believe that he was not actually residing at the reported address. In *Dally*, the parolee did not return messages left for him at his reported address and the parole officer was unable to locate him there. In *Watts*, the parole officer had found the parolee at his reported residence only once after more than fifty prior visits to his reported address. On that one trip, the officer found that the "residence" "lacked the usual signs of residency, such as clothing and personal belongings." *Watts*, 67 F.3d at 795. Then, while conducting surveillance of Watts, the police observed him walk up to his reported address and knock on the door; when no one responded, he left, "strongly suggesting that Watts did not live there." *Id.* In *Conway*, after more than twenty visits, the officer had only found Conway at his reported residence once, and the only property there that could be identified as Conway's was a single pair of socks. Only in *Harper* did we uphold a search when police lacked grounds to believe that the parolee had reported a sham address—and in *Harper* the parolee did not have *any* reported address on file.

**[4]** Second, in each of these four cases, the officers had directly observed something that gave them good reason to

---

[10]We do not consider *Motley* in this analysis, because in that case the police were searching the residence that Motley had most recently reported as his own.

suspect that the parolee was using his unreported residence as his home base: In *Dally* and *Watts*, the police saw the parolee running errands to and from the residence. In *Harper*, the police saw Harper entering and leaving the house on his own multiple times in the days before the search; they also saw the cars of his known associates parked outside. In *Conway*, the officer saw mail and notes addressed to Conway at the address in question.

[5] Third, in each of *Dally*, *Harper*, *Watts*, and *Conway*, the parolee had a key to the residence in question.[11] In three of these four cases—*Dally*, *Harper*, and *Conway*—the police saw the parolee use his key to enter the residence.[12] In *Dally* and *Conway*, officers saw the parolee use his key on the same day that they searched the residence in question; Harper was observed entering with his key a few times over the three-day period preceding the search.

[6] Lastly, in two of these cases, either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee. Conway referred to one of the bedrooms as "his," *Conway*, 122 F.3d at 843, and Sonja Lee, Watts's girlfriend and the legal occupant of the house in question, told police that she and Watts lived there together, *Watts*, 67 F.3d at 793. It will often be against a parolee's penal interests to admit to living at an unreported residence; such an admission is thus unlikely to be motivated by self-interest and is therefore entitled to some credibility. The same logic applies to a similar statement made by a co-resident of the parolee.[13]

---

[11]The *Watts* court explicitly did not consider this fact in making its decision. 67 F.3d at 796 n.1. However, it is worth noting that, as a factual matter, Watts did have a key.

[12]In *Watts*, the police saw Watts enter the residence searched, but it is unclear whether or not he used his key to do so. *See* 67 F.3d at 793, 795.

[13]By the same logic, the denial by a parolee or his co-resident that the parolee lives at an unreported address is not necessarily entitled to credi-

**[7]** None of these commonalities is presented by the facts of this case. While Aquino had visited Howard at home ten times and had only found him there twice, Aquino testified that this was not a particularly low success rate, especially in light of Howard's potential work schedule. At 20%, Aquino's success rate in visiting Howard was much higher than the parole officers in *Watts* ($< 2\%$) and *Conway* ($< 5\%$).[14] Aquino also spoke to a neighbor on at least three of those visits; in one of those conversations the neighbor informed Aquino that he had just missed Howard, and in the other the neighbor confirmed that Howard was still living at the East Owens residence. Unlike *Watts* and *Conway*, on the occasions when Aquino did find Howard at the East Owens address, the residence looked as if Howard was still living there. Nor was this case like *Dally*; there is no indication that Howard did not respond to messages left at his East Owens address. Aquino testified that he had not been worried that Howard was not

---

bility because it is frequently tinged with self-interest. We have therefore accorded little import to such denials in our case law. *See, e.g.*, *Motley*, 432 F.3d at 1082 ("[The co-resident's] statement that [the parolee] did not live at that address, coming from a less-than-disinterested source, did not undermine the information the officers previously had received . . . ."); *Dally*, 606 F.2d at 862, 863. In this case, Barner clearly had a motive to lie. Even though she knew that Howard was already violating the conditions of his release by seeing her, she might well have reasoned that he was more likely to be re-incarcerated if officers discovered that he had completely flouted the conditions of his supervised release by moving in with her. Since their relationship was presumably a violation of her parole as well, she would also want to downplay the extent of contact she had with Howard in order to keep herself out of custody. But, of course, the fact that she denied that Howard lived there certainly cannot be taken as evidence that he actually did live there.

[14]In *Watts*, the parole officer had made weekly visits to the reported residence for fourteen months but had only seen him there once, constituting one successful visit in at least sixty attempts. 67 F.3d at 795. In *Conway*, the parole officer had one successful visit in twenty-one attempts. 122 F.3d at 842. It is not clear from *Dally* what the officer's success rate was with home visits. In *Harper*, the parolee did not have a reported address, so there was no success rate to consider.

living at the East Owens address until after he got the call from the CI.

Just as there was more evidence that Howard was still living at the East Owens address than that the parolees in *Dally*, *Watts*, and *Conway* were living in their reported residences, there was also less evidence that Howard was living on West Bonanza. Aquino's investigation revealed that several of the Bonanza complex's residents and staff had seen Howard there before, and that he had been there with Barner. However, the mere fact that he had visited Barner there in early February was not sufficient to create probable cause that Howard *lived* there at the end of March. This is especially true in light of the fact that the police had watched the West Bonanza residence for nearly an entire month and there were no reports of Howard even entering the apartment complex, let alone Barner's apartment. The search was conducted on March 30; prior to that day, the police had not seen either Howard or his car in the West Bonanza complex since February 7. February 7 was also the last time that police had had contact with the CI, the only person who had ever actually said that Howard was living at West Bonanza. On the day of the search, even the apartment manager who had seen Howard in the complex in early February told the police that he had not seen Howard there in at least a week and a half.

The best evidence the police had that Howard lived at West Bonanza was the statement by one of Barner's neighbors that she had seen Howard there "at least eighty to ninety percent of the time." However, this statement was not credible, as it was utterly irreconcilable with the prior observations of the surveilling officers; it was also contradicted by the statements of the complex's staff. The evidence that Harper was living at West Bonanza was much flimsier than the strong evidence the police directly observed in other cases—repeated errand-running in *Dally* and *Watts*, numerous comings and goings and known associates congregating in *Harper*, and mail, notes, and personal effects in *Conway*.

The police also affirmatively knew that Howard did not have a key to the West Bonanza residence, as they checked each of his keys against Barner's door on the morning of the search. Ultimately, the police needed to be let in by Jacobs, the apartment's owner, before they could conduct their search. This stands in stark, diametric contrast to *Dally*, *Harper*, *Watts*, and *Conway*, in each of which the parolee had a key, and in three of which the police saw him use it.

Nor did either Howard or Barner tell police that Howard lived at West Bonanza, as happened in *Watts* and *Conway*. While each acknowledged that Howard had a few things there, each repeatedly and consistently denied that Howard lived at the West Bonanza residence in the strongest possible terms, and Barner ultimately stormed off, furious. The facts of this case simply do not track the exacting fact patterns that we approved in *Dally*, *Harper*, *Watts*, and *Conway*.

On the other hand, this case does resemble *Watts II* in an important way. Here, the police significantly relied on the fact that they saw Howard stretching in the doorway of Barner's apartment the morning of the search. This very closely parallels *Watts II*, where we held that "the mere fact that [a man] answered the door of his girlfriend's home in his boxer shorts did not establish a reasonable belief that he lived there." 256 F.3d at 890.

**[8]** We therefore hold that the police do not have probable cause to believe that a parolee lives at an unreported residence when: (1) visits to the parolee's reported address suggested that the parolee continued to reside there; (2) the police watched the address in question for a month and did not see the parolee there; (3) no credible witnesses had seen the parolee at the address in question for some time before the search; (4) the parolee did not have a key to the residence in question; and (5) neither the parolee nor his purported co-resident admitted to his residence there.

**[9]** The magistrate judge and district court erred in finding that the facts of this case provided the police with probable cause to believe that Howard resided in the West Bonanza apartment. Because Howard only admitted that the gun was his after the police search found the gun, these self-incriminating statements must also be excluded as fruit of the poisonous tree.

## III.   CONCLUSION

We reverse the district court's ruling that the police had probable cause to believe that Howard resided at the West Bonanza residence.

**[10]** The judgment of the district court is REVERSED, and the plea of guilty is VACATED.

---

NOONAN, Circuit Judge, concurring, *dubitante*:

"In sum, we hold that before conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched." *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc). Applying this standard with the help of five cases where we found probable cause "but just barely," the majority concludes that probable cause was lacking here. I cannot deny the controlling standard set by *Motley* and the pattern of what constitutes probable cause are not unreasonably presented. Bound by circuit precedent, I cannot suppress a doubt that circuit precedent conforms with the constitution as interpreted by the United States Supreme Court.

As recently as 2000, this circuit distinguished between "probationary searches" and "investigative searches" directed at uncovering evidence of criminal activity by a felon on pro-

bation. In *United States v. Knights*, 534 U.S. 112 (2001), this distinction was held to be without foundation. *Id*. at 122. The Supreme Court analyzed the search of the probationer's premises in terms of what was reasonable, assessing "reasonable," on the one hand, in the degree a search intruded on a probationer's privacy and, on the other hand, in the degree a search was needed to promote legitimate governmental interests. *Id.* at 118-19.

As far as the individual was concerned, the Supreme Court noted that a probationer was a person undergoing punishment. A probationer did not enjoy "some freedoms enjoyed by law-abiding citizens." *Id.* at 119. The condition set on probation as to search "significantly diminished Knights' reasonable expectation of privacy." *Id*. at 120.

As to the government's interest, it is "the very assumption of the institution of probation" that a probationer is more likely than an ordinary citizen to violate the law. *Id.* at 120 (quotation omitted). And that assumption is borne out by the discouraging statistics on the criminal acts of probationers. *Id*. Along with the consequent need for greater governmental vigilance goes the incentive that a probationer has to go to greater lengths to conceal his new criminal activity, which, if detected, will send him back to prison in a summary proceeding. *Id*.

It does not seem to me that the majority's conclusion here takes into account either Howard's diminished expectation of privacy or the government's interest in keeping him from possession of a firearm. In effect, Howard is given a safe house where, as long as he has a cooperative girlfriend, he can stash his gun. That safety zone is surely not what the majority wants to create but it is the result of the rigid application of our precedents without attention to the perspectives on reasonableness introduced by *Knights*.

My doubt is doubled by the teaching that "the Fourth Amendment protects people, not places." *Katz v. United*

*States*, 389 U.S. 347, 351 (1967). Application of this insight in *Katz* enlarged the scope of the protection. Application here contracts it: a probationer gets less protection than the innocent homeowner. The contraction is not a problem. Application of axioms across the board sometimes help, sometimes hurt particular parties. That the Fourth Amendment should not offer special sanctuary to felons serving part of their sentence is an outcome not to be regretted.