**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARMANDO CUEVAS; HEATHER
BURLETTE,

     *Plaintiffs-Appellants,*

     v.

JON DE ROCO; THE EL DORADO
COUNTY SHERIFF'S OFFICE; JEFF
NEVES; RICHARD HORN; MICHAEL
COOK; CHRISTOPHER STARR; BRIAN
GOLMITZ,

     *Defendants-Appellees,*

     and

RICK RIMMER; SHARON JACKSON,
and THE VON HOUSEN AUTOMOTIVE
GROUP, doing business as
Mercedes Benz of El Dorado
Hills,

     *Defendants.*

No. 06-15403

D.C. No.
CV-04-02092-
MCE/GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, District Judge, Presiding

Argued and Submitted December 3, 2007
Submission Vacated December 5, 2007
Resubmitted June 27, 2008
San Francisco, California

Filed June 27, 2008

Before: Betty B. Fletcher, Marsha S. Berzon, and
Johnnie B. Rawlinson, Circuit Judges.

7661

Per Curiam Opinion

**COUNSEL**

Mark A. Miller (argued), of the El Dorado Hills Law Group, for the plaintiffs-appellants.

James E. Flynn (argued), David A. Carrasco, Frances T. Grunder, James M. Humes, and Bill Lockyer, of the office of the Attorney General of the State of California, for the state defendant-appellee.

Franklin G. Gumpert (argued), of Barkett & Gumpert, for the county defendants-appellees.

**OPINION**

PER CURIAM:

Plaintiffs Armando Cuevas and Heather Burlette appeal the district court's grant of summary judgment against them on their civil rights action brought pursuant to 42 U.S.C. § 1983.[1] Although Plaintiffs alleged a variety of constitutional violations in the district court, they press on appeal only their claim that a warrantless entry into their residence on February 25, 2004, was unlawful under the Fourth Amendment to the Constitution.

Viewing the facts in the light most favorable to Plaintiffs, as we must, we conclude that Deputy Sheriff Christopher Starr violated Plaintiffs' Fourth Amendment rights and is not entitled to qualified immunity. We therefore reverse the district court's grant of summary judgment to Starr. However, we conclude that Deputy Sheriffs Richard Horn and Michael Cook did not violate Plaintiffs' Fourth Amendment rights, and we therefore affirm as to them. Plaintiffs do not argue on appeal that their Fourth Amendment rights were violated by Sheriff Jeff Neves, Sergeant Brian Golmitz, or the County of El Dorado. Accordingly, we affirm as to those Defendants as well.[2]

## I. Statement of Facts

This case arises out of a botched attempt by law enforcement to locate a parolee in Plaintiffs' residence. On September 19, 1999, the parolee, Randy Witmore, was arrested in

---

[1]We decline to strike Plaintiffs' opening brief, which, despite some inaccuracies, adequately states their case.

[2]Plaintiffs also sued several other parties, including Parole Agent Jon de Roco, but they have either settled with those parties or have not pursued their case against them on appeal. De Roco's superiors, Rick Rimmer and Sharon Jackson, were dismissed by stipulation in the district court.

Diamond Springs, California, for possession of explosive devices, apparently after he was stopped for driving under the influence. On the arrest form, Witmore's residence is listed as 464 Capella Drive in Diamond Springs ("the Diamond Springs address").

However, from 1990 to May 2003, that address belonged to the family of Lori Rodrigues, a friend of Witmore's. While it is not clear whether Witmore also may have lived at the Diamond Springs address around the time of his 1999 arrest, Rodrigues declared that Witmore did not live at the Diamond Springs address between September 2001 and May 2003. In December 2001, when Witmore's parole officer telephoned the Diamond Springs address to ask how Witmore was doing, Rodrigues informed the parole officer that Witmore did not live there and that there was an order in place requiring Witmore to stay away from her.

On March 5, 2002, Witmore was sent to prison after his probation was revoked, but, on July 29, 2003, he again was paroled. Witmore's parole form lists Witmore as "homeless," as living with "no one," and as having no telephone number. The parole form also notes that Witmore is "[t]rying to get into Ridgeview." The form does list Rodrigues at the Diamond Springs address, but only as an emergency contact.

Witmore's parole was again revoked when, on August 1, 2003, Witmore was arrested for battery. The Department of Corrections "charge sheet," dated August 11, 2003, lists Witmore's last known address as "2980 Coloma Rd., Placerville." Public telephone records reveal that this address belongs to a boarding house called Ridgeview Manor. Witmore was returned to prison on September 10, 2003.

On January 16, 2004, Witmore was once more released on parole. In February 2004, Parole Agent Jon de Roco was assigned to Witmore's case. Witmore's case file revealed that Witmore had failed to report to the parole unit as he had been

instructed to do. Accordingly, de Roco and his supervisor decided that de Roco would prepare the paperwork necessary to seek a warrant for Witmore's arrest as an absconded parolee. De Roco and his supervisor further decided that, as part of the process of preparing the paperwork, de Roco would go to the emergency contact address listed on Witmore's July 2003 parole form — the Diamond Springs address — and attempt to obtain information about Witmore's whereabouts. If de Roco found Witmore there, he would take him into custody.

On February 25, 2004, de Roco contacted the El Dorado County Sheriff's Office and was placed in contact with Deputy Sheriffs Starr, Horn and Cook. De Roco informed the deputies that he intended to do a "knock and talk" at the Diamond Springs address, which is "where you knock on the door and talk to who opens it."[3] De Roco informed the deputies that "Witmore was wanted and if located would be taken into custody."

That evening, de Roco met with the deputies at a convenience store near Cuevas's residence. At the meeting, according to Deputy Horn's deposition, de Roco showed the deputies a "flyer" with a photo of Witmore and an address on it, which, the record suggests, was a "face sheet" from the Parole and Community Services Division of the California Department of Corrections. The "face sheet" lists Witmore's most recent address as "Self, Placerville" with a street address "to be determined." The "face sheet" further indicates that Witmore had lived in Placerville since December 2002. In addition to viewing the "flyer" or "face sheet," the deputies looked up Witmore in the ACIS local law enforcement database, which indicated that during three contacts with the Sher-

---

[3]De Roco testified at his deposition that the telephone number associated with the Diamond Springs address on Witmore's parole form was disconnected, but he did not know when it had been disconnected and did not remember whether he called the number on the day of the search.

iff's Office in 2001 and 2002 Witmore had provided the Diamond Springs address. The deputies made no further inquiries into Witmore's current residence.

After the meeting, the deputies and de Roco headed to the Diamond Springs address. By that time, Rodrigues no longer lived there. She had sold the house in April 2003 and moved out in May 2003. Plaintiffs and their infant child had moved in. Plaintiff Cuevas may bear a general resemblance to Witmore, although their appearances are far from identical.

When the deputies and de Roco arrived at the Diamond Springs address they saw cars parked in the driveway and lights on inside the house. They did not run a check on the cars' license plates but instead approached the house and got into position. The deputies wore bullet-proof black vests with a cloth star on the left breast and the word "Sheriff" on the right breast as well as on the back. De Roco, too, wore a dark-colored bullet-proof vest, but his vest bore no insignia. Over his vest de Roco wore an open Hawaiian shirt with the tails tucked behind his "duty belt," on which were his holstered gun, his handcuff pouch, and his badge. De Roco also wore hiking boots and jeans.

Deputies Cook and Horn walked to the back of the house, through an open gate in the fence, and stood in the yard. De Roco and Deputy Starr walked up to the front door. It was dark outside, there was no porch light on, and curtains covered the front window, so the area was only slightly illuminated by ambient light from inside the home and from surrounding residences.

De Roco knocked on the door several times. Plaintiffs, who were working in their home office, heard the knocks, and Cuevas walked to the door. Cuevas looked out the window but, because of the darkness, could not see anything. Deputy Starr, looking through an opening in the curtains on the front window, saw someone by the door and said to de Roco, "He's

right here." Next, de Roco heard Cuevas say, "Who is it?," to which de Roco answered "State Parole." De Roco then heard Cuevas say, "Who?," to which de Roco again responded, "State Parole," but in a louder voice.

At that point Cuevas opened the door approximately four to six inches. De Roco, who had been standing by the left door jamb, stepped to his right towards the door opening. Deputy Starr stood behind and to the left of de Roco. De Roco made eye contact with Cuevas and said either, "Is your name Randy," or, "Randy?" Cuevas looked down for a moment with his hands at his sides, paused briefly, and then began to swing the door closed. De Roco, who thought he had found Witmore and wanted to arrest him, put his foot between the door and the door jamb and began pushing against the door with his shoulder and his hands to prevent it from closing. Deputy Starr moved to de Roco's right and also began pushing against the door.

Cuevas was "really scared" and believed that someone was trying to break into his house and hurt his family. He called out for Plaintiff Burlette to dial 911. Cuevas pushed back against the door and, when de Roco and Deputy Starr gained momentum, he reached around the door and punched de Roco in the mouth, chipping his teeth. De Roco and Deputy Starr continued to push against the door and gained entrance into the residence. A short struggle ensued during which Deputy Starr repeatedly announced, "Sheriff's Department, put your hands behind your back." Eventually de Roco and Deputy Starr were able to subdue and handcuff Cuevas.

When Deputy Starr went to look for Burlette, he found her on the telephone with the 911 dispatcher and "in hysterics." The dispatcher and Deputy Starr calmed Burlette down and explained that the officers were looking for Witmore. Burlette informed Deputy Starr that Witmore did not live there. Deputy Starr went "to look around for Mr. Witmore" in a protective sweep of the residence, but the only other person present

was Plaintiffs' baby. The record indicates that at least one of the Plaintiffs consented to Deputy Starr's protective sweep.

In the meantime, Deputies Cook and Horn, who had heard an altercation and a woman screaming inside, moved from the backyard to the front of the house. Deputy Horn entered the house and spoke briefly with Burlette to further explain the situation. He then went back outside and waited on the porch. Deputy Cook did not go inside the house but waited in the doorway.

Next, Burlette retrieved Cuevas's driver's license and the deputies confirmed that Cuevas was not Witmore. After consulting with other officers, Deputy Starr arrested Cuevas for knowingly performing a battery on a custodial officer, in violation of California Penal Code § 243.1. However, the district attorney decided not to press charges because, he concluded, Cuevas had not known that de Roco was an officer.

Plaintiffs sued for damages, alleging violations of their rights under the Fourth, Fifth and Fourteenth Amendments, as well as various violations of state law. Defendants moved for summary judgment and, in the alternative, for qualified immunity. The district court submitted the case on the briefs and granted summary judgment in favor of Defendants on all claims. Because the district court found no constitutional violation, it did not determine whether Defendants were protected by qualified immunity. Plaintiffs timely appealed.

## II.   Standard of Review

"A grant of summary judgment is reviewed de novo." *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007). Summary judgment is appropriate only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "In determining whether

summary judgment is appropriate, we view the facts in the light most favorable to the non-moving party and draw reasonable inferences in favor of that party." *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007).

## III. Discussion

## A. Violation of the Fourth Amendment

The entry into Plaintiffs' home commenced when de Roco put his foot in the door opening and, together with Deputy Starr, began pushing against the door in an attempt to open it. This warrantless entry was unconstitutional.

**[1]** "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Brigham City, Utah v. Stuart*, 126 S. Ct. 1943, 1947 (2006) (quotation marks omitted). Indeed, "physical entry into the home is the chief evil against which the wording of the Fourth Amendment is directed." *Frunz v. City of Tacoma*, 468 F.3d 1141, 1142 (9th Cir. 2006) (quotation marks omitted); *see also Silverman v. United States*, 365 U.S. 505, 511 (1961).

**[2]** The warrantless entry into Plaintiffs' home cannot be justified as a search for a parolee in what might have been the parolee's residence. Although the residence of a parolee may be searched even if the police suspect no wrongdoing, *see Samson v. California*, 547 U.S. 843, 856 (2006), "before conducting a warrantless search . . . law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched," *Motley v. Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc). And, absent such probable cause, "[n]othing in the law justifies the entry into and search of a third person's house to search for the parolee." *Id.* at 1079. We consider, therefore, what information the deputies had about Witmore's residence at the moment they began the entry.

The record reveals that de Roco provided the deputies with the Diamond Springs address and informed them that it was an "emergency contact address." There is no indication that de Roco represented to the deputies that Witmore actually lived at the Diamond Springs address. When asked in his deposition whether de Roco had made such a representation, Deputy Horn responded only that de Roco "had reason to believe that he thought Witmore could possibly be there." Moreover, the fact that de Roco told the deputies that he wanted to do a "knock and talk" indicates that he was basically trying to learn of Witmore's whereabouts and, at most, was hoping that he might be fortunate enough to find Witmore there.

Indeed, despite the fact that the ACIS database indicated that Witmore had provided the Diamond Springs address in 2001 and 2002, the record indicates that the deputies understood that Witmore was not currently living at the Diamond Springs address. The record supports the inference that de Roco showed the deputies a "face sheet" stating that Witmore lived in Placerville. In their depositions, Deputy Horn testified that he understood the Diamond Springs address to be an "emergency contact address," and Deputy Starr testified that he merely "assum[ed]" that the Diamond Springs address was Witmore's residence "at some time."

Even if the "flyer" that de Roco showed the deputies was *not* the "face sheet," the deputies made no effort to determine whether Witmore had provided de Roco or any other authorities an address other than the Diamond Springs address after 2002. If they had made such an effort, the deputies would have learned from the August 2003 parole form that Witmore's last known address was the Ridgeview Manor in Placerville. They might also have learned that, in December 2001, Lori Rodrigues informed Witmore's parole officer that Witmore did not live at the Diamond Springs address. Further, the deputies conducted no surveillance at the Diamond Springs address to determine whether Witmore lived there,

they did not even determine that Rodrigues still lived there (by checking property records, for example), and they did not run a check on the license plates of the cars parked outside the residence on the night of the search.

Viewing the record in the light most favorable to Plaintiffs, we conclude that, based on the limited information in their possession, the deputies lacked probable cause to believe that Witmore resided at the Diamond Springs address.

[3] The fact that Cuevas tried to close the door when he was asked whether his name was "Randy" does not change our conclusion. Cuevas explained that he thought de Roco — whose Hawaiian shirt, jeans and hiking boots masked that he was a government officer — was a "bad man" who might harm his family. This explanation is a plausible reason for closing the door when a stranger came to his house at night. Although Deputy Starr's clothing more clearly identified him as a government officer, the evidence indicates that Deputy Starr was not visible to Cuevas because he was standing behind and to the side of de Roco. That Cuevas subsequently punched de Roco does not affect our analysis, because the punch occurred after de Roco and Deputy Starr had already begun to enter the house.

[4] Nor does the fact that de Roco thought Cuevas resembled Witmore change our conclusion. Even if the deputies were permitted to rely on de Roco's belief that Cuevas resembled Witmore, *see United States v. Jensen*, 425 F.3d 698, 705 (9th Cir. 2005) (observing that when there has been communication among agents, probable cause can rest upon the investigating agents' collective knowledge), the deputies would not have had probable cause to believe that Witmore resided at the Diamond Springs address, *see Watts v. County of Sacramento*, 256 F.3d 886, 890 (9th Cir. 2001) ("*Watts II*") ("[T]he mere fact that [plaintiff] answered the door of his girlfriend's home in his boxer shorts did not establish a reasonable belief that he lived there.").

**[5]** In sum, the information suggesting that Witmore might have resided at the Diamond Springs address was several years old, uncorroborated by available sources, and contradicted by two more recent pieces of information, both of which indicated that Witmore lived in Placerville. Neither de Roco nor the deputies had contact with Witmore — or anyone who knew Witmore and could reliably provide information concerning his residence — prior to the search. Moreover, de Roco knew, and so informed the deputies, that the Diamond Springs address was merely an emergency contact address at which he sought to perform a "knock and talk."

The contrast with the kind of information that does meet the applicable probable cause standard is stark. For example, in *Motley* the police searched the apartment of the parolee's girlfriend, where the parolee also lived at some point, approximately three months after she had moved in. 432 F.3d at 1075-76. While the parolee was, as it turned out, in custody at the time of the search, the police had gathered information about the parolee within a month of the search that indicated the apartment as the parolee's last known address. *Id.* at 1076, 1080 & n.6. In addition, a police officer who participated in the search had had contact with the parolee on previous occasions — including once at the apartment — during which the parolee and his grandmother had confirmed that the parolee lived at the apartment. *Id.* at 1080-81. Although the girlfriend — "a less than disinterested source" — told the officers who came to search the apartment that the parolee did not live there and that he was in custody, we concluded that the officers nonetheless had probable cause to believe that the parolee resided at the apartment. *Id.* at 1076, 1082.

The information available to de Roco and the deputies suggesting that Witmore might have lived at the Diamond Springs address was significantly less reliable than the information available to the officers in *Motley*. Thus, the information did not meet our "relatively stringent standard [for] determining what constitutes probable cause that a residence

belongs to a person on supervised release." *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006).

More generally, in *Howard* we surveyed four cases in which a search was proper and identified several patterns:[4]

> First, in each of these cases the parolee did not appear to be residing at any address other than the one searched. In three of these four cases, the parolee had reported a different address, but officers had good reason to believe that he was not actually residing at the reported address. . . .
>
> Second, in each of these four cases, the officers had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base[.] . . .
>
> Third, in each of [these cases] the parolee had a key to the residence in question. . . .
>
> Lastly, in two of these cases, either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee.

447 F.3d at 1265-66.

The facts of this case fit into none of the patterns identified in *Howard*. First, the evidence indicating that Witmore might have lived at the Diamond Springs address stemmed from 2002 or earlier, Department of Corrections records from 2003 and 2004 indicated that Witmore's last known address was in Placerville, and the deputies did not have good reason to

---

[4]Those four cases are *United States v. Conway*, 122 F.3d 841 (9th Cir. 1997), *United States v. Watts*, 67 F.3d 790 (9th Cir. 1995), *United States v. Harper*, 928 F.2d 894 (9th Cir. 1991), and *United States v. Dally*, 606 F.2d 861 (9th Cir. 1979).

believe that Witmore was nonetheless residing in Diamond Springs. Second, the deputies had made no observations that gave them good reason to believe that Witmore lived at the Diamond Springs address. Third, there is no evidence that Witmore had a key to Plaintiffs' residence. Fourth, there is no evidence that after 2002 Witmore ever indicated that he lived at the Diamond Springs address, nor that Rodrigues, his listed emergency contact, lived there after 2003, nor that Plaintiffs ever indicated that Witmore lived there.

[6] Thus, viewing the facts in the light most favorable to Plaintiffs, we conclude that the officers lacked probable cause to believe that Witmore lived at the Diamond Springs address and that, accordingly, Deputy Starr violated Plaintiffs' Fourth Amendment rights by assisting de Roco in pushing against the door and forcibly entering the residence.[5]

[7] However, Deputies Horn and Cook did not violate Plaintifffs' Fourth Amendment rights by entering the residence.[6] Deputy Horn briefly entered the residence, and Deputy Cook went to stand in the doorway, only after they heard an altercation and a woman screaming inside the residence. At that point there was an objectively reasonable basis for concluding that there was an immediate need to protect persons inside the

---

[5]Because the warantless entry was unconstitutional regardless of Witmore's parole status, we need not consider Cuevas and Burlette's arguments concerning California parole law and policy.

[6]Plaintiffs have not alleged in their complaint that Deputies Horn and Cook violated their Fourth Amendment rights by entering their fenced backyard before leaving the backyard and entering the residence through the front door. Nor do they "coherently develop[ ]" such an argument on appeal. *United States v. Kimble*, 107 F.3d 712, 715 n.2 (9th Cir. 1997); *see also Ghahremani v. Gonzales*, 498 F.3d 993, 997 (9th Cir. 2007); Fed. R. App. P. 28(a)(9). Accordingly, we do not consider whether Deputies Horn and Cook's warrantless entry into the backyard constituted an unlawful intrusion into the residence's curtilage. *See United States v. Dunn*, 480 U.S. 294, 300-01 (1987); *United States v. Romero-Bustamente*, 337 F.3d 1104, 1107 (9th Cir. 2003).

home from serious harm. *See United States v. Snipe*, 515 F.3d 947, 951-52 (9th Cir. 2008).

**[8]** Deputy Starr's protective sweep "to look around for Mr. Witmore" also did not violate Plaintiffs' Fourth Amendment rights. It is clear that at least one of the Plaintiffs consented to such a sweep and neither objected. *See United States v. Murphy*, 516 F.3d 1117, 1122 (9th Cir. 2008) ("It is well established that a person with common authority over property can consent to a search of that property without the permission of the other persons with whom he shares that authority.") (citations omitted). However, the record indicates that, as part of the sweep, Deputy Starr opened at least one drawer. Doing so exceeded both the consent given and the limits of a lawful protective sweep incident to an in-house arrest. *See Maryland v. Buie*, 494 U.S. 325, 327 (1990) (explaining that a permissible protective sweep "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding"). Accordingly, Deputy Starr also violated Plaintiffs' Fourth Amendment rights in this regard, although any damages caused are likely minimal.

## B. Qualified Immunity

Deputy Starr nonetheless contends that he is protected by qualified immunity. Having concluded that Deputy Starr violated Plaintiffs' Fourth Amendment rights, we must determine whether, in the specific context of this case, those constitutional rights were clearly established at the time of the violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Motley*, 432 F.3d at 1077. We conclude that they were.

**[9]** First, it was well-established at the time of the entry of Plaintiffs' home that, absent exigent circumstances, police may not enter a person's residence for purposes of search or seizure without a warrant. *See, e.g.*, *Payton v. New York*, 445 U.S. 573, 586 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home

without a warrant are presumptively unreasonable.") (internal quotation marks omitted).

**[10]** Second, it was well-established at the time of the entry that police could search a residence for a parolee without a warrant only if their belief that a parolee lived there was based on the equivalent of probable cause.

In so holding, we recognize that the terms used to describe this standard were somewhat unclear at the time of the entry into Plaintiffs' home. In *United States v. Dally*, 606 F.2d 861, 863 (9th Cir. 1979), we held that officers must have a "reasonable basis" to think that a parolee lived at an address they wished to search. We later stated that "probable cause" to think so was required, *see United States v. Harper*, 928 F.2d 894, 896 (9th Cir. 1991); *United States v. Watts*, 67 F.3d 790, 795-96 (9th Cir. 1995) ("*Watts I*"), *overruled on other grounds*, 519 U.S. 148 (1997), so "this question was a matter of some confusion," *Howard*, 447 F.3d at 1262 n.5, before we held that probable cause was the proper standard in *Motley*, 432 F.3d at 1080.

**[11]** This inconsistency does not, however, settle the matter in Deputy Starr's favor. However the standard was described, his conduct fell well below it. The facts of *Dally* make clear how stringent the "reasonable basis" standard was. The officers in that case had a reasonable basis "for the belief that [the parolee] lived" at a residence when they saw him enter the residence a week before the police entry; "photographed him taking out the garbage, bringing in his laundry and talking with neighbors"; later saw that his car had been parked there overnight, and, on the day of the entry, observed him "return[ ] with dry cleaning, change[ ] his clothes and [leave] the apartment carrying laundry." 606 F.2d at 862. And the police did not commence entry until the parolee "returned again with more dry cleaning" and "used a key to open the door." *Id.* Recounting the facts of *Dally* in *Howard*, we concluded that the "police had strong evidence" supporting their search, and

analyzed *Dally* as part of a line of "probable cause"-based cases, s*ee Howard*, 447 F.3d at 1262-63 & 1262 n.6.

In subsequent cases, as noted, *supra* note 4, we employed the probable cause standard "stringent[ly]." *Howard*, 447 F.3d at 1262; *see also id.* at 1263-64 (discussing later cases). So, despite some confusion as to the formulation of the standard, we have long held that there must be strong evidence to think that a parolee resides at an address before the address can be searched without a warrant.

[12] Whatever doubt might have remained on that point was disposed of by *United States v. Gorman*, 314 F.3d 1105 (9th Cir. 2002). *Gorman* is not a parole search case, but concerned the "related context[ ]," *Motley*, 432 F.3d at 1079, of whether police had "reason to believe" that a criminal for whom they had an arrest warrant was present in a third party's residence, justifying entry into that residence without a search warrant or consent. *Gorman*, 314 F.3d at 1110. We concluded that our case law's requirement that the police have a "reasonable belief" that a person lives at a particular residence "should be read to entail the same protection and reasonableness inherent in probable cause." *Id*. at 1114-15.

*Gorman* reinforced the principle that our prior parole search cases strongly suggested: The "reasonable basis" standard does not depart in any important regard from the "probable cause" standard, and the police therefore cannot conduct a warrantless search of a residence in search of a parolee unless their belief that the parolee resides there is based on the equivalent of probable cause. *See Gorman*, 314 F.3d at 1110-11, 1114-15. *Motley*, of course, cleared up any remaining ambiguity by acknowledging the holding in *Gorman* and stating, in the parole search context, that "[w]e see no reason to depart from [its] conclusion here." 432 F.3d at 1080.

[13] The information Deputy Starr acted upon fell well below the "reasonable basis" standard as applied in the cases

decided before the events underlying this case. It would therefore be clear to a reasonable officer in Deputy Starr's position, considering his actions in light of the then-existing case law, that his conduct was unlawful. *See Saucier*, 533 U.S. at 202.

Finally, the limits of a lawful protective sweep were also clearly established at the time of the search. *See Buie*, 494 U.S. at 327.

**[14]** Accordingly, Deputy Starr is not protected by qualified immunity.

## IV.   Conclusion

**[15]** The record, viewed in the light most favorable to Plaintiffs, establishes that Deputy Starr violated Plaintiffs' Fourth Amendment rights by participating in the forced entry of the residence and by opening at least one drawer during the protective sweep. Moreover, Deputy Starr is not protected by qualified immunity. Accordingly, we reverse the grant of summary judgment to Deputy Starr and remand for trial concerning the constitutional violations.[7] However, we affirm as to the other Defendants.

The parties shall bear their own costs.

**AFFIRMED in part, REVERSED in part, and REMANDED.**

---

[7]We note that Cuevas's arrest was not unlawful because it was supported by probable cause. Accordingly, neither Deputy Starr nor any of the other Defendants is liable for damages resulting from the arrest itself.