**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.

HECTOR RUBEN LOPEZ, a/k/a
HECTOR RUBEN PIRATE, RUBEN
HECTOR, RUBEN "PIRATE" LOPEZ-
HECTOR,

            *Defendant-Appellant.*

No. 05-50616

D.C. No.
CR-01-00079-RJT

OPINION

Appeal from the United States District Court
for the Central District of California
Robert J. Timlin, Senior District Judge, Presiding

Submitted October 18, 2006*
Pasadena, California

Filed February 5, 2007

Before: Harry Pregerson, Ronald M. Gould, and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Gould

*The panel finds this case appropriate for submission without oral argument pursuant to Federal Rule of Appellate Procedure 34(a)(2).

**COUNSEL**

Richard D. Rome, Esq., Van Nuys, California, for defendant-appellant Hector Ruben Lopez.

Jerry A. Behnke, Assistant United States Attorney, Riverside, California, for plaintiff-appellee United States of America.

**OPINION**

GOULD, Circuit Judge:

Hector Ruben Lopez appeals his guilty-plea conviction for possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1). Lopez argues that his conviction should be overturned because his federal prosecution was initiated in retaliation for his refusal to cooperate with FBI investigators, and because the police seized the incriminating methamphetamine during an unconstitutional parole search. We have jurisdiction under 28 U.S.C. § 1291, and we affirm the district court.

**I**

Under California law, every prisoner eligible for release on state parole "shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause." CAL. PENAL CODE ANN. § 3067(a) (West 2000). In 1998, Lopez was paroled for an earlier conviction. As a condition of his parole, he agreed to and signed a notice that stated, "[y]ou and your residence and any property under

your control may be searched without a warrant by an agent of the Department of Corrections or any law enforcement officer."

In June 2001, Lopez was a suspected member of an Ontario, California gang known as the Ontario Black Angels ("OBA"), with an outstanding warrant for his arrest because he had absconded from parole supervision. On June 20, 2001, Glen Willett, then a Senior Special Agent of the California Department of Corrections, received information that Lopez was located at a residence on Oakland Avenue, in Ontario, California. During surveillance, Willett and Ontario Police Department ("OPD") officers observed Lopez's mother and brother, Joe Martel, enter the Oakland Avenue residence. Martel was a known OBA gang member who was also on parole. After Willett and OPD officers observed Martel, but not Lopez's mother, leave the Oakland Avenue residence,[1] the officers approached the residence and knocked on the front door. Through a window in the door, Willett saw Lopez "peek around the corner from a hallway." Willett ordered Lopez to open the door, but Lopez disappeared down the hallway out of sight. A few minutes after Willett and the OPD officers unsuccessfully tried to force entry, Lopez opened the door and was arrested a few feet outside the front door. The officers saw Lopez's girlfriend, Valerie Etchart, in the residence, ordered her outside the front door, and also detained her.

The officers conducted a protective sweep of the residence, forcing entry into a back bedroom. In the hallway bathroom toilet, officers found an empty clear plastic baggy. After the residence was secured, the officers conducted a parole search of the residence. During the parole search, officers found plastic baggies containing methamphetamine and three handguns.

---

[1]After leaving the Oakland Avenue residence, OPD officers stopped Martel, who displayed symptoms of being under the influence of a controlled substance. Officers then arrested Martel for parole violations.

On June 27, 2001, Bureau of Alcohol, Tobacco, Firearms, and Explosives Special Agent David Silva told Assistant United States Attorney Jerry Behnke of Lopez's arrest and requested federal prosecution of Lopez. Behnke accepted the case for prosecution pending further investigation, and opened a case file for Lopez on July 5, 2001.

In early July 2001, Behnke informed the Deputy District Attorney assigned to Lopez's case, Sully Moore, that he would be seeking a federal indictment on Lopez. Moore told Behnke that Lopez had a state court appearance set for mid-July, that he would try to continue the case until the federal indictment was filed, and that when it was filed, he would dismiss the state charges.

On July 11, 2001, at his preliminary hearing attended by two federal agents, Lopez pled guilty to a state charge of felon in possession of a firearm. About a week later, Moore informed Behnke that he had forgotten that a federal indictment would be sought against Lopez, that he had accepted a plea proposal from Lopez's attorney, and only after the state court concluded the plea proceedings did Moore remember Behnke would be seeking a federal indictment against Lopez.

In late September 2001, FBI Special Agent Volk interviewed Lopez, for a second time, about Lopez's knowledge of the OBA, and advised Lopez that he "could be looking at serious federal time" unless he cooperated. Lopez refused to cooperate. Lopez was thereafter indicted by a federal grand jury for being a felon in knowing possession of firearms, in violation of 18 U.S.C. § 924(c), and for possession of methamphetamine with intent to distribute.

Lopez filed a motion to dismiss the federal indictment, alleging that the federal prosecution was vindictive, in violation of his due process rights. He also filed a motion to suppress the evidence seized from the Oakland Avenue residence on Fourth Amendment grounds. The district court denied both

motions. Lopez pled guilty to possession of methamphetamine with intent to distribute, reserving the right to appeal the denial of his motions to dismiss and suppress. Lopez was sentenced to 169 months in prison, and he timely appealed.

## II

We first address Lopez's claim that the district court erroneously denied his motion to dismiss his indictment for vindictive prosecution. Although we recognize that our standard of review for a vindictive prosecution case is unsettled,[2] we have previously said that we review a district court's decision whether to dismiss an indictment based on improper government conduct de novo. *See United States v. Bridges*, 344 F.3d 1010, 1014 (9th Cir. 2003).

[1] "A prosecutor violates due process when he seeks additional charges solely to punish a defendant for exercising a constitutional or statutory right." *United States v. Hernandez-Herrera*, 273 F.3d 1213, 1217 (9th Cir. 2001) (citation omitted). To establish a prima facie case of prosecutorial vindictiveness, Lopez "must show either direct evidence of actual vindictiveness or facts that warrant an appearance of such." *United States v. Montoya*, 45 F.3d 1286, 1299 (9th Cir. 1995) (internal quotation marks and citation omitted). If Lopez provides "[e]vidence indicating a realistic or reasonable likelihood of vindictiveness" this "give[s] rise to a presumption of vindictiveness on the government's part." *United States v. Garza-Juarez*, 992 F.2d 896, 906 (9th Cir. 1993) (citation omitted). The burden then shifts to the prosecution to show that " 'independent reasons or intervening circumstances dispel the appearance of vindictiveness and justify its deci-

---

[2]*See United States v. Hernandez-Herrera*, 273 F.3d 1213, 1217 (9th Cir. 2001) (citation omitted) (recognizing that we have applied abuse of discretion, clearly erroneous, and de novo standards). Because Lopez's claim of prosecutorial vindictiveness fails regardless of which standard is applied, we need not decide today which is the proper standard of review.

sions.' " *Montoya*, 45 F.3d at 1299 (quoting *United States v. Hooton*, 662 F.2d 628, 633 (9th Cir. 1981)).

Lopez argues that the federal indictment filed against him should be dismissed because the federal prosecution arose out of the same facts as his state guilty plea, and the federal government indicted Lopez for "noncooperation" with the FBI in its OBA gang investigation. In support, Lopez contends that because the federal agents at his preliminary hearing did not prevent Lopez's state plea from going forward, despite the prior agreement between Moore and Behnke to drop the state charges once a federal indictment for Lopez was issued, the federal government was under an obligation not to pursue his federal prosecution. Furthermore, Lopez contends that the FBI's threat of "serious federal time" during an interview, coupled with Lopez's refusal to cooperate with the FBI, proves vindictive prosecution.

**[2]** We disagree with Lopez, and conclude that his arguments do not present either direct evidence, or facts that warrant an appearance, of vindictiveness. *See Montoya*, 45 F.3d at 1299. Although Behnke and Moore did have an agreement to stay the state proceedings and Moore would drop the state charges when the federal indictment was issued, Moore explained that given his caseload he forgot about that agreement. That the state Deputy District Attorney forgot to stay the plea proceedings pending a federal indictment does not show proof of vindictiveness by the federal government in proceeding with Lopez's prosecution.

Moreover, although federal agents were present at Lopez's state plea hearing, it is possible that they were unaware of the Moore-Behnke agreement. Even if they were aware of that agreement, Lopez is incorrect that the FBI agents' failure to stop the state plea hearings produced an obligation on the part of the federal government not to pursue the federal prosecution. As a separate sovereign, the federal government was still entitled to prosecute Lopez for federal offenses, even ones

stemming from the same facts as his state guilty plea. *See United States v. Zone*, 403 F.3d 1101, 1104 (9th Cir. 2005).

**[3]** Also, the FBI's threat of "serious federal time" falls short of evidence of vindictiveness. A prosecutor, and presumably field officers too, may threaten a defendant with prosecution during an interview or plea negotiations, and if that defendant chooses not to cooperate or plead guilty, the prosecutor is free to initiate a prosecution. *See Bordenkircher v. Hayes*, 434 U.S. 357 (1978) (declining to find actual or apparent vindictiveness where a prosecutor initiated a prosecution against a defendant for a more serious charge after the defendant refused to plead guilty to existing allegations). The FBI agents' threat was an attempt to encourage Lopez to assist them in the OBA gang investigation and does not establish vindictiveness by the federal government.

**[4]** Even if we were to assume, for sake of argument, that Lopez has set forth facts that warrant an appearance, or raise a presumption, of vindictiveness, the federal government gave sufficient independent evidence to rebut this presumption. The district court found that both the Moore-Behnke agreement, and Behnke's decision to pursue a federal prosecution on the same facts supporting the state charges, occurred before Lopez pled guilty to state charges, not after. Moreover, Behnke's decision on July 5, 2001, to pursue a federal indictment of Lopez, occurred before the FBI's warning to Lopez in the late September interview. This independent evidence rebuts any presumption that the federal government prosecuted Lopez because he refused to cooperate with an FBI investigation. We conclude that the district court properly denied Lopez's motion to dismiss.

**III**

We next turn to Lopez's argument that both the protective sweep and the parole search of the Oakland Avenue residence were unlawful under the Fourth Amendment, and that the evi-

dence seized should be suppressed. We review a district court's denial of a motion to suppress de novo. *See United States v. Meek*, 366 F.3d 705, 711 (9th Cir. 2004). The district court's factual findings are reviewed for clear error. *See United States v. Bynum*, 362 F.3d 574, 578 (9th Cir. 2004).

This issue is controlled by the recent United States Supreme Court case *Samson v. California*, ___ U.S. ___, 126 S. Ct. 2193 (2006). *Samson* involved the suspicionless search of a parolee's person under the same California statute governing Lopez's case.[3] The Court granted a writ of certiorari to address this question: Does a suspicionless search, conducted under the authority of this California statute, violate the Fourth Amendment? *See Samson*, 126 S. Ct. at 2196. The Court held it did not.

**[5]** The Court began: "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abides by certain rules during the balance of the sentence." *Id.* at 2198 (citation and internal quotation marks omitted). The Court concluded that under the totality of the circumstances, "including the plain terms of the parole search condition, . . . [Samson] did not have an expectation of privacy that society would recognize as legitimate." *Id.* at 2199.

**[6]** The Court explained that for inmates who elect parole, the California parole-search statute mandates that a parolee "submit to suspicionless searches by a parole officer or other peace officer 'at any time.' " *Id.* (citing CAL. PENAL CODE ANN. § 3067(a)). This statute, reasoned the Court, served California's interest in reducing recidivism, promoting public safety, and reintegrating parolees into productive society. *Id.* at 2200-01 n.4. Because the petitioner in *Samson* signed a

---

[3]The California parole-search statute provides that a parolee is subject to a warrantless, suspicionless search by a law enforcement officer at any time. *See* CAL. PENAL CODE ANN. § 3067(a).

parole order submitting to suspicionless search conditions, the Court held that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id*. at 2202.[4]

**[7]** The protective sweep and parole search at issue in Lopez's motion to suppress must be viewed in light of *Samson*. Like the petitioner in *Samson*, Lopez signed a parole condition allowing him, his residence, and any property under his control to be "searched without a warrant" by any law enforcement officer. Under *Samson*, the officers had authority to conduct a full parole search at the moment they knocked on Lopez's front door to arrest him. Because a protective sweep is a less extensive search than a parole search, *Samson* necessarily makes both the protective sweep, and the parole search, lawful.

**[8]** *Samson* involved a suspicionless search of a parolee's person, not of a parolee's residence. However, we conclude that this is not a significant difference in light of the Supreme Court's rationale. The California parole-search statute at issue in *Samson* also governed Lopez's conditions of parole. Lopez signed a Notice and Conditions of Parole form that gave Lopez notice that his person, his property, and his residence were subject to a warrantless, suspicionless search at any time. The Supreme Court founded its holding in *Samson* on the conclusion that under a parole-search statute, such as California's, parolees do "not have an expectation of privacy that society would recognize as legitimate." *Id*. at 2199. If under the California parole-search statute, a parolee has no expectation of privacy in his person, we reason that a parolee has no legitimate expectation of privacy in his residence either, at

---

[4]Although *Samson* was issued by the United States Supreme Court after the facts of Lopez's conviction, Lopez's case is on direct review and under the doctrine of *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987), any new constitutional rule of criminal procedure applies to his case during his appeal on direct review.

least when the parolee is present. Any other rule would diminish the protection to society given by the search condition of parole, permitting search at any time. *See also United States v. Knights*, 534 U.S. 112, 119-120 (2001) (holding that a warrantless search of a probationer's residence[5] was valid where the probationer's reasonable expectation of privacy was "significantly diminished" because of the probation conditions he was informed of, and agreed to).[6] Together, *Samson* and *Knights* stand for the principle that under parole conditions a parolee has notice of and agrees to, officers may conduct a warrantless, suspicionless search of a parolee's person or residence. We hold that because Lopez signed a Notice and Conditions of Parole submitting himself and his residence to a warrantless, suspicionless search, the parole search in question did not violate the Fourth Amendment.

## IV

In summary, the record shows that there was no legal error. First, the district court properly denied Lopez's motion to dismiss his indictment for vindictive prosecution. Second, we hold that under *Samson,* because the California parole-search statute governed Lopez's parole, and Lopez signed a Notice and Conditions of Parole submitting himself and his residence to a warrantless, suspicionless search, neither the protective

---

[5]For Fourth Amendment purposes, "[w]e have consistently recognized that there is no constitutional difference between probation and parole." *Motley v. Parks*, 432 F.3d 1072, 1083 n.9 (9th Cir. 2005) (en banc) (citation and internal quotation marks omitted).

[6]We note that *Knights* left open the issue decided in *Samson*:

> We do not decide whether the probation condition so diminished, or completely eliminated, Knights's reasonable expectation of privacy . . . that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment. The terms of the probation condition permit such a search, but we need not address the constitutionality of a suspicionless search . . . .

*Knights*, 534 U.S. at 120 n.6.

sweep nor the parole search in question violated the Fourth Amendment.

**AFFIRMED.**