**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellant*, | No. 11-50498 |
| v. | D.C. No. 2:10-cr-00262-SVW-1 |
| LAMBERT T. GRANDBERRY, *Defendant-Appellee*. | OPINION |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
February 14, 2013—Pasadena, California

Filed September 17, 2013

Before: Marsha S. Berzon and Paul J. Watford, Circuit
Judges, and Jed S. Rakoff, Senior District Judge.[*]

Opinion by Judge Berzon;
Concurrence by Judge Watford;
Concurrence by Judge Berzon

---

[*] The Honorable Jed S. Rakoff, Senior District Judge for the U.S.
District Court for the Southern District of New York, sitting by
designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed the district court's suppression of evidence found during a warrantless search of an apartment that the defendant, a parolee, had entered several times during the days preceding the search.

The panel rejected the government's argument that this court's precedent requiring that officers have probable cause to conclude that a parolee lives at an address before carrying out a warrantless search pursuant to a parole search condition is no longer binding law in light of *Samson v. California*, 547 U.S. 843 (2006).

Applying this court's "relatively stringent" standard, the panel held that the officers' observations were insufficient evidence to establish that the defendant lived at the apartment they searched.

The panel also held that where, as here, it is abundantly clear that the searched property is a residence, a parole condition permitting searches of "your residence and any property under your control" is triggered only when the officers have probable cause that the parolee *lives* at a residence.

The panel remanded for further proceedings.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Concurring, Judge Watford wrote that *United States v. Howard*, 447 F.3d 1257 (9th Cir. 2006), which established the rule that parolees have a greater expectation of privacy in someone else's home than they have in their own home, is unsound and warrants reexamination.

Concurring, Judge Berzon wrote separately to respond to Judge Watford's suggestion that applying *Howard* here permits a parolee to assert greater than Fourth Amendment protection in someone else's home than in his own home and is unsound and warrants reexamination.

---

## COUNSEL

André Birotte Jr., United States Attorney; Robert E. Dugdale, Assistant United States Attorney, Chief, Criminal Division; Jean-Claude André (argued), Assistant United States Attorney, Criminal Appeals Section, Los Angeles, California, for Plaintiff-Appellant.

Carlton F. Gunn (argued), Of Counsel, Kaye, McLane & Bednarski, Pasadena, California, for Defendant-Appellee.

---

## OPINION

BERZON, Circuit Judge:

After police officers arrested Lambert Grandberry, they decided to search a nearby apartment Grandberry had entered several times — at least six — in recent days. The officers relied on Grandberry's status as a parolee as their authority to search the apartment and so did not obtain a warrant. We

must address whether the police complied with our precedents requiring that officers have probable cause to conclude that a parolee lives at an address before carrying out a warrantless search pursuant to a parole search condition.

The district court determined that the officers did not have the requisite probable cause with regard to whether Grandberry lived at the apartment searched and so ordered suppression of evidence found there, including a firearm and about seventy-five grams of crack cocaine. We review the district court's decision to suppress evidence de novo, and its factual findings supporting that decision for clear error. *See United States v. Song Ja Cha*, 597 F.3d 995, 999 (9th Cir. 2010). For the reasons that follow, we affirm.

## I.

In January 2010, Los Angeles Police Department (LAPD) Detective Patrick Aluotto received an anonymous tip that someone was selling crack cocaine out of a garage behind 2351 W. 31st Street in Los Angeles. Aluotto contacted an informant who had previously provided reliable information about drug sales. The informant identified the 31st Street garage as "Looney's spot." An LAPD officer who had previously arrested Grandberry clarified that "Looney" was Grandberry's pseudonym. Aluotto and LAPD Officer Cesar Orozco, using a database listing Grandberry's criminal history, learned that Grandberry was on parole for a California felony conviction. One of Grandberry's parole conditions was that "[y]ou and your residence and any property under your control may be searched without a warrant by an agent of the Department of Corrections or any law enforcement officer." *See also* Cal. Code Regs. tit. 15, § 2511(b)(4) (2009); Cal. Penal Code § 3067(a) (2009). The

two officers also learned from that database that Grandberry lived at 10652 South Manhattan Place in Los Angeles. Aluotto and the informant drove past the 31st Street garage, where the informant identified a red Pontiac parked outside as Grandberry's.

After reviewing a photograph of Grandberry, Aluotto, Orozco, and LAPD Officer Armando Mendoza (collectively, the "Officers") conducted surveillance at the 31st Street address. On January 14, Mendoza observed Grandberry hand a woman a bag of "a substance [that] appeared to be crack cocaine" in exchange for cash.[1]

Rather than arresting Grandberry on the spot, Aluotto, Orozco, and Mendoza decided to "conduct additional surveillance" "to gauge the extent of his narcotics activities." Sometime later in mid-January, the Officers followed Grandberry as he drove from the 31st Street garage to an apartment building at 3418 S. Arlington Avenue, a distance of about two blocks. In the following days, the Officers — sometimes individually and sometimes as a group — observed Grandberry drive between the two locations "in a peculiar manner — cutting . . . through an alley[]," as if "to evade law enforcement detection."

The Officers focused their surveillance of Grandberry almost exclusively on the Arlington apartment building, which they visited on a number of occasions between January 14 and January 25, at various times, usually between noon and 10 p.m. While parked outside the building, they observed Grandberry enter the building using "keys he held"

---

[1] A separate group of LAPD officers arrested the woman for possession of a controlled substance during a traffic stop shortly thereafter.

at least six times, and perhaps ten. Except once, Grandberry entered the building alone; on one occasion, he entered with a female companion. Another time the Officers saw the same woman arrive at the building alone. On some of the occasions on which the Officers observed Grandberry go into the building, they saw "movement or activity through the window of [a] second-floor unit" just after Grandberry entered, and at least once they saw Grandberry "looking out of the window of that apartment unit."

One officer conducted surveillance after 10 p.m. but never saw Grandberry at the Arlington apartment building past ten or during the early morning. None of the Officers checked the names on the building's mailboxes to see if Grandberry received mail there. None of them ever observed him carrying groceries, laundry, newspapers, or mail. None asked any neighbors whether Grandberry lived there; examined the building's trash for whether it contained anything of Grandberry's; or investigated who leased or lived in the Arlington apartment.

Once, the Officers saw Grandberry leave the Arlington apartment building, approach a parked vehicle, hand a man a white paper bag, then re-enter the building. Other officers detained the man, who was carrying $9,000 in cash. The man was not charged with any offense.

The Officers knew that Grandberry had reported to his parole officer that he lived on South Manhattan Place, the same address the California Department of Motor Vehicles (DMV) had on file for Grandberry. Two of the Officers conducted "very brief" surveillance at that address for about an hour on a single afternoon or evening in January. They did not see Grandberry. The two observed that the house

appeared occupied; they did not interview anyone at the house or any neighbors as to whether Grandberry lived there. Nor did they ask Grandberry's parole officer whether Grandberry lived on South Manhattan Place, because they "did not want to inadvertently tip [Grandberry] off to [the] continuing investigation."

On January 25, the Officers decided to arrest Grandberry for the January 14 narcotics sale. They went to the Arlington address, where they saw him leave the apartment building and drive away in the Pontiac. When he later returned and stepped out of the car, but before he had entered the building, the Officers identified themselves as police. Grandberry thereupon ran away and tossed keys to the ground; the Officers chased after him. Ultimately, Aluotto and Mendoza used physical force to detain Grandberry. Orozco picked up the keys, approached Grandberry, and according to Orozco, said: "You are on parole with search conditions. We are going to search your place now." Orozco later testified that Grandberry responded: "Do what you gotta do." Grandberry denies that such a "conversation . . . took place."[2] The Officers did not ask Grandberry whether he lived at the Arlington apartment, or who did live there.

Orozco agreed at the suppression hearing that the Officers had "plenty of time" to get a search warrant but took no steps to do so. Instead, they used Grandberry's keys to enter first the apartment building and then the apartment in which they had previously observed Grandberry. Once in the apartment,

---

[2] The district court made no factual finding as to whether this conversation between Orozco and Grandberry took place. The court deemed Orozco's testimony credible in other respects and made no credibility determination as to Grandberry.

the Officers discovered cocaine (in the kitchen and in a bedroom closet); a loaded gun (in a hallway closet); male clothing (in the hallway); and mail addressed to Grandberry at the Manhattan Place address. They later found more cocaine in the red Pontiac parked outside.

A federal grand jury indicted Grandberry of one count of distributing more than five grams of crack cocaine (the crack sold on January 14), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(iii) (2006); one count of possessing more than fifty grams of crack cocaine (the crack found in the Arlington apartment, which alone was more than fifty grams, as well as that in the red Pontiac, which was only a few grams), in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii) (2006); and one count of possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (2006).

Grandberry moved to suppress the crack cocaine and the gun found in the Arlington apartment, on the ground that the Officers lacked probable cause that the apartment was his residence.[3] To establish standing to seek suppression, he submitted a declaration stating that the Arlington apartment was his girlfriend's and that he had stayed there overnight as an invited guest a few times in December 2009 and January 2010, including the night before the search. After initially denying suppression, the district court granted reconsideration and suppressed the evidence found in the

---

[3] Grandberry initially moved to suppress the crack cocaine found in the Pontiac, but he later abandoned that argument in the district court and does not press it on appeal. He never sought suppression of the crack cocaine sold on January 14.

Arlington apartment. The government timely took an interlocutory appeal under 18 U.S.C. § 3731.

## II.

The question before us is whether the warrantless search of the Arlington apartment was valid under the Fourth Amendment because Grandberry was subject to a parole search condition. The government contends that the search was permissible for either of two reasons: first, the Officers had probable cause that the Arlington apartment was Grandberry's residence; and alternatively, the provision of Grandberry's search condition authorizing searches of "any property under [his] control" permitted the search. We address each argument in turn.

## A.

Police or parole officers may lawfully conduct searches of parolees or their residences without satisfying the Fourth Amendment's warrant requirement when certain conditions are met. One such condition is that the parolee is subject to a provision authorizing such warrantless searches. *See United States v. Lopez*, 474 F.3d 1208, 1212–14 (9th Cir. 2007) (citing *Samson v. California*, 547 U.S. 843 (2006)), *overruled in part on other grounds*, *United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc) (per curiam). Under our precedents, a second such condition is that "[b]efore conducting a warrantless search" of a residence "pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched." *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006) (quoting *Motley v.*

*Parks*, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc), *overruled in part on other grounds*, *King*, 687 F.3d 1189).

**1.**

We begin by addressing the government's argument that *Motley*, *Howard*, and their progeny are no longer binding law in light of *Samson*. For this proposition the government relies on language in *Samson* stating that the parolee in that case lacked "an expectation of privacy that society would recognize as legitimate." 547 U.S. at 852. The government contends that *Samson* overruled our cases establishing that unless the officers who search a residence in reliance on a parole condition pertaining to residential searches have probable cause to believe that the residence is that of the parolee, the parolee can exclude evidence obtained in the search from use in a criminal prosecution.

As a three-judge panel, "as long as we can apply our prior circuit precedent without running afoul of [*Samson*], we must do so." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (internal quotation marks omitted). We conclude that we can.

**(a)** Substantively, the *Motley/Howard* rule is certainly not "clearly irreconcilable," *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc), with *Samson*'s holding that parolees are subject to suspicionless searches under some circumstances. First, *Samson* involved a search of the parolee's person, not his residence. *See* 547 U.S. at 847. So it had no reason to address the degree of knowledge officers must have with regard to a parolee's place of residence before searching it in reliance on a parole condition. Consequently,

and not surprisingly, nothing in *Samson* discusses that question.[4]

Second, *Motley*, which did squarely address that question and was followed as to that point in *Howard*, proceeded from the premise that the answer does not depend on the degree of suspicion as to wrongdoing required for a parole or probation search. We recognized in *Motley* that "[a] state may closely supervise parolees and impinge on their privacy rights to a greater extent than on the rights of the general public." 432 F.3d at 1083. And *Motley* post-dated *United States v. Knights*, 534 U.S. 112 (2001), which held that officers need only reasonable suspicion of *wrongdoing* to conduct a warrantless search of a probationer's residence pursuant to a search condition. *Motley* nonetheless settled on the stricter probable cause standard as the required level of suspicion regarding *residence*, holding that "a condition of parole that permits warrantless searches provides officers with the limited authority to enter and search a house where the parolee resides, even if others also reside there. But they have to be reasonably sure that they are at the *right* house." *See Motley*, 432 F.3d at 1079. Because *Motley* and *Howard* were decided after *Knights* — which set a standard of *wrongdoing* lower than probable cause — we may not rely on *Samson* to set aside the probable-cause-as-to-*residence* requirement simply because *Samson* allows parole searches without suspicion of *wrongdoing*.

**(b)** The government maintains at some junctures in its argument that its contention is one of Fourth Amendment

---

[4] Nor does *Lopez*, the case in which we held that *Samson* applies to residential searches in reliance on a parole condition, address the *Motley*/*Howard* rule. *See* 474 F.3d 1208.

standing, not of substance. On that view, no parolee would have standing to seek suppression of evidence obtained in violation of the *Motley/Howard* rule, although a non-parolee resident whose home is searched in reliance on another individual's parole search condition may have a suppression remedy or the right to bring an affirmative action under 42 U.S.C. § 1983. *Samson* does not require such a dichotomy.

Under our precedents, Grandberry has standing to assert that the search of the Arlington apartment violated the Fourth Amendment by virtue of his status as an overnight guest there. *See United States v. Gamez-Orduño*, 235 F.3d 453, 458 (9th Cir. 2000) (citing *Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990)); *see also Olson*, 495 U.S. at 96 (holding that "status as an overnight guest is alone enough" to establish standing to assert a violation of the search of a host's home).

Prior to *Samson*, we applied the *Motley* rule not only in the § 1983 context but also in cases involving parolee-defendants' motions to suppress, as long as Fourth Amendment standing was otherwise established. In *Howard*, for example, the defendant stayed overnight at his girlfriend's apartment the night before the search. *See* 447 F.3d at 1261. Howard's objection to the search of that apartment was premised on the fact that the search was *not* of his home. *See id.* at 1258. Applying *Motley*, and concluding that there was no probable cause that Howard lived in the residence searched, we reversed the district court's denial of the motion to suppress. *Id.* at 1268.

*Samson* is not itself a case about Fourth Amendment standing, and it does not purport to change the requisites for raising a challenge to a substantively invalid search.

Moreover, the government is wrong in asserting that *Samson* stripped parolees of *any* Fourth Amendment protection.

*Samson* specifically disavowed the notion that its opinion rested on "equa[ting] parolees with prisoners for the purpose of concluding that parolees, like prisoners, have no Fourth Amendment rights," pointing out that "[i]f that were the basis of our holding . . . there would have been no cause to resort to Fourth Amendment analysis." *Samson*, 547 U.S. at 850 n.2. Reflecting that assurance, *Samson* went on to refer to "a parolee's *substantially diminished* expectation of privacy," *id.* at 855 (emphasis added), a characterization inconsistent with the notion that the Fourth Amendment does not protect parolees at all. In contrast, the sentence from *Samson* on which the government relies — "that [Samson] did not have an expectation of privacy that society would recognize as legitimate" — pertains to the particulars of Samson's own "totality of the circumstances . . . including the plain terms of the parole search condition [allowing for suspicionless searches of a parolee's *person*]," not to any and all searches and seizures of a parolee's property or places associated with the parolee, whether covered by the parole condition or not. *See id.* at 852.

Consistent with its recognition that parolees are not exempt from Fourth Amendment protection, *Samson* left open, for example, the possibility that a parolee subject to a search condition could challenge searches conducted by officers who lacked "knowledge that the person stopped for the search is a parolee," as well as for "arbitrary, capricious or harassing searches." *Id*. at 856 & n.5. Like the first of the exceptions *Samson* expressly left open, the *Motley/Howard* rule concerns a *precondition* for a search pursuant to a parole

condition — namely, warrantless entry into a particular residence — not the propriety of the parole search itself.

**(c)** For all these reasons, neither the substance of the *Motley*/*Howard* "probable cause" requirement as to a parolee's residence, nor the recognition that a parolee-defendant who otherwise has Fourth Amendment standing can seek to exclude from trial evidence obtained from a search not meeting that requirement, is "clearly irreconcilable with [*Samson*'s] reasoning or theory." *Miller*, 335 F.3d at 893. We therefore must apply our long-established probable-cause-as-to-residence requirement. *See id.*

**2.**

Applying the *Motley*/*Howard* rule, probable cause as to residence exists if an officer of "reasonable caution" would believe, "based on the totality of [the] circumstances," that the parolee lives at a particular residence. *United States v. Diaz*, 491 F.3d 1074, 1077–78 (9th Cir. 2007); *Howard*, 447 F.3d at 1262.[5] We have stressed that this is a "relatively

---

[5] In some of the cases *Howard* surveyed, the court analyzed the residence issue under a "reasonable suspicion" standard. *See Howard*, 447 F.3d at 1262 n. 5–6. *Motley* clarified that probable cause is the proper standard for determining whether a parole lives at the residence searched. *See Motley*, 432 F.3d at 1080.

Although *Howard* and *Motley* were parolee cases, several of the cases *Howard* analyzed involved searches of probationers, rather than parolees. At the time *Howard* was decided, our cases assumed that both groups had equivalent Fourth Amendment interests. In *King*, sitting en banc, we "overrule[d]" those cases insofar as they "conflict[ed] with the Supreme Court's holding that 'parolees have fewer expectations of privacy than probationers.'" *See King*, 687 F.3d at 1189 (quoting *Samson*, 547 U.S. at 850)). Because neither the holdings nor the analysis in our precedents

stringent" standard, *see United States v. Franklin*, 603 F.3d 652, 656 (9th Cir. 2010), which requires more than "a mere well-founded suspicion," *Howard*, 447 F.3d at 1262. "[T]here must be strong evidence" that the parolee resides at the address. *Cuevas v. de Roco*, 531 F.3d 726, 736 (9th Cir. 2008) (per curiam).[6]

In implementing this standard, we have identified "certain patterns" that "clearly emerge[d]" in most cases in which officers have probable cause to conclude that a parolee lived in a residence "not reported by [the] parolee" as his address. *See Howard*, 447 F.3d at 1265. The "patterns" *Howard* enumerated were: (1) "the parolee did not appear to be residing at any address other than the one searched"; (2) "the officers had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base"; (3) "the parolee had a key to the residence in question"; and (4) "either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee." *Id.* at 1265–66. These

---

assessing probable cause as to whether parolees and probationers lived in particular residences depended on the purported Fourth Amendment equivalence between those two groups, we discuss those precedents without regard to whether they analyzed searches of probationers or parolees.

[6] Unlike Fourth Amendment standing, which can be assessed based on evidence unknown to police officers at the time of a search, *see* Wayne R. LaFave, Search and Seizure § 11.3, at 162 (5th ed. 2012), "the determination of probable cause is based" only on "the totality of the circumstances known to the officers at the time of the search," *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 918 (9th Cir. 2012) (en banc); *see* LaFave, Search and Seizure § 11.3. For that reason, Grandberry's affidavit that he occasionally stayed overnight in the Arlington apartment is relevant to his Fourth Amendment standing but not to the Officers' probable cause.

factors are viewed cumulatively rather than independently for purposes of assessing probable cause as to residence. Although the ultimate question whether probable cause exists is "fact-intensive," and cannot be answered by cross-checking a list of factors, *see Ornelas v. United States*, 517 U.S. 690, 703 (1996), *Howard*'s synthesis of our precedents, reiterated in *Cuevas*, *see* 531 F.3d at 734, guides our application of the probable cause standard to the facts known to the Officers before they conducted the warrantless search of the Arlington apartment.

The government contends that the following facts, in combination, were sufficient to establish probable cause that Grandberry lived at the Arlington apartment: (1) Grandberry responded to Orozco's announcement that the Officers were about to search his "place" by saying: "Do what you gotta do"; (2) the Officers did not observe Grandberry at his reported Manhattan Place residence on the single occasion that they conducted "very brief" surveillance there; (3) the Officers observed Grandberry at the Arlington apartment about six to ten times during their afternoon and evening surveillance there (but not during their less frequent nighttime operations); and (4) Grandberry used a key to enter the Arlington apartment. Under our "relatively stringent" standard, *see Franklin*, 603 F.3d at 656, we conclude that the Officers' observations, considered in their totality, are insufficient to establish probable cause that Grandberry lived at the searched residence.

First, both Orozco's statement and Grandberry's response were entirely ambiguous. Orozco announced that the Officers were "going to search [Grandberry's] place." Grandberry responded: "Do what you gotta do." Orozco's reference to "your place" gave no indication that Orozco

viewed the Arlington apartment as Grandberry's residence. Grandberry could easily have understood "your place" to refer to "your garage down the block on 31st Street," or the South Manhattan Place address. Moreover, Grandberry's response was not an admission of anything. Instead, it signaled recognition of the fact that the Officers, who had just "restrain[ed] and control[led]" Grandberry, were going to pursue their investigation of his activities as they saw fit; they did not ask for his consent to do so, and he did not give it. Grandberry's resigned response cannot reasonably be understood either as admitting that he lived at the Arlington address or as acquiescing that the search of that apartment was consistent with his parole condition.

The weakness of the government's reliance on the "your place" interchange between Grandberry and Orozco is highlighted by comparing that exchange with those in cases in which we have concluded that "either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee." *See Cuevas*, 531 F.3d at 734; *Howard*, 447 F.3d at 1266. For example, in *United States v. Conway*, 122 F.3d 841 (9th Cir. 1997), the defendant referred to a *bedroom* "as 'his.'" *Id.* at 843. And in *United States v. Watts*, 67 F.3d 790 (9th Cir. 1995), *rev'd on other grounds*, 519 U.S. 148 (1997),[7] a legal occupant of the house "told police that she and [the defendant] *lived* there together." *Id.* at 793 (emphasis added). Grandberry's very different response to Orozco is, by comparison, of no value in establishing that an officer of reasonable caution would conclude that Grandberry lived at the Arlington apartment.

---

[7] We have continued to cite *Watts*'s analysis as persuasive in applying the probable cause standard. *See Howard*, 447 F.3d at 1263–64.

Second, as the district court found, the Officers' surveillance of Grandberry's *reported* residence — at South Manhattan Place — was "very peripheral." In more than thirty years of assessing whether officers had probable cause to believe that a parolee or probationer lived at a searched residence, we have never found probable cause where, as here, the parolee officially and consistently reported a residential address other than the one searched, unless there was an affirmative and substantial basis for concluding that he did not actually live there. *See Cuevas*, 531 F.3d at 734; *Howard*, 447 F.3d at 1265.[8]

Here, the Officers knew when they conducted surveillance at the Arlington apartment that six months earlier, Grandberry had reported to his parole officer that he resided on South Manhattan Place. The Officers also knew that Grandberry had reported that same address to the California Department of Motor Vehicles. The Officers nonetheless conducted only the most cursory surveillance of the South Manhattan Place address. They visited it exactly once, by sitting for an hour or two in the middle of the day in a parked car outside the house. Although the Officers observed that the residence was occupied, they made no attempt to determine who lived there. They never sought permission from the home's occupants to enter; made no attempt to locate or interview any neighbors; and never contacted Grandberry's parole officer to determine whether

---

[8] Two cases post-dating *Howard*'s and *Cuevas*'s synthesis of our precedents are not to the contrary. In *Franklin*, the defendant had not reported any residential address. 603 F.3d at 654. And in *United States v. Mayer*, 560 F.3d 948 (9th Cir. 2009), the police received multiple reports, corroborated by other evidence, that the defendant lived at the searched address. *Id.* at 957.

the officer had conducted home visits at the South Manhattan Place address. Nor did they conduct surveillance during early morning or evening hours, when someone who lived there was most likely to be at home.

The cases in which we have concluded that officers had "good reason to believe that [a parolee] was not actually residing at [his] reported address," *Howard*, 447 F.3d at 1265, presented far more facts in support of that conclusion than these. In *United States v. Dally*, 606 F.2d 861 (9th Cir. 1979) (per curiam), for example, "the parolee did not return messages left for him at his reported address[,] and the parole officer was unable to locate him there." *Howard*, 447 F.3d at 1265. The parole officer in *Watts* visited the defendant at his reported address weekly for fourteen months, finding him there only once. *See* 67 F.3d at 795. And police had observed Watts knock on the door of his reported address and leave when there was no answer, "strongly suggesting that [he] did not live there." *Id.* at 795–96. Similarly, in *Conway*, an officer had visited the defendant's reported address twenty-one times but found Conway there only once. *See* 122 F.3d at 842–43.

In comparison, the Officers' surveillance at South Manhattan Place was perfunctory. Their meager attempt to conduct any "further inquiries" into Grandberry's reported residence at South Manhattan Place, confirmed by his driver's license address, weighs against the reasonableness of their conclusion that Grandberry lived elsewhere. *See Cuevas*, 531 F.3d at 730.**[9]**

---

**[9]** Of course, officers may have probable cause that a parolee lives at "more than one residence," given sufficient observations. *See Case v. Kitsap Cnty. Sheriff's Dept.*, 249 F.3d 921, 930–31 (9th Cir. 2001). But

Third, Grandberry's repeated presence at the Arlington apartment is certainly entitled to some weight in the probable cause analysis. We have emphasized several times, however, that a parolee's presence at a residence, even if frequent, does not, standing alone, establish probable cause that the parolee lives there. Our cases distinguish between evidence that a parolee had "visited" a particular residence and evidence that a parolee "*lived* there." *Howard*, 447 F.3d at 1267 (emphasis in original). Even when there is evidence that the parolee has "spent the night there occasionally," we have concluded that such evidence is "insufficient" to establish residence. *See id.* at 1262.

In *Howard*, for example, the officers lacked probable cause as to residence even though police saw the defendant "stretching in the doorway of [the searched] apartment the morning of the search." *Id.* at 1268. And in *Watts v. County of Sacramento*, 256 F.3d 886 (9th Cir. 2001), the police lacked a "reasonable belief" that a person who "answered the door . . . in his boxer shorts" sometime after 9:30 p.m. lived in the searched residence. *Id.* at 888–90.

Here, the Officers never observed *any* signs that Grandberry stayed overnight at the Arlington apartment, even though some of the surveillance was conducted late in the evening. Nor did anyone — including the confidential informant who tipped off the Officers as to Grandberry's drug

---

here, the Officers never claimed that they believed Grandberry had multiple residences, only that his reported address was likely "a sham one, listed in order to divert attention from his illegal activities." Under our case law, the Officers' paltry effort to determine whether Grandberry lived at his reported address weighs against a determination that the Officers reasonably believed that he did not.

activity — report that Grandberry lived at the Arlington apartment. *Cf. Franklin*, 603 F.3d at 654–55 (holding that probable cause existed in part because of confirmation by a motel clerk, immediately before the search, that the defendant had "personally rented" the motel room in question and was "currently" staying there); *Mayer*, 560 F.3d at 957 (holding that two tips, including one from a reliable informant, that a defendant lived at a particular residence (at which he also was known to have previously resided) supported probable cause as to residence).

Moreover, in cases in which we have concluded that police officers had probable cause as to residence, they "had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base." *Cuevas*, 531 F.3d at 734; *Howard*, 447 F.3d at 1265–66. Such indicia of a "home base" have included "taking out the garbage," and "bringing in" and "carrying" out "laundry" and "dry cleaning." *Dally*, 606 F.2d at 862. Here, the Officers did not report seeing Grandberry conduct any such activities. In their nearly two weeks of surveillance, the only thing that they saw him carry in or out of the apartment was a substantial sum of cash — a fact which, as the district court concluded, might be indicative of his use of the Arlington apartment as a base from which "to conduct drug business," but did not suggest that the apartment was his residence.

Of the facts that we have considered so far, then, Grandberry's presence at the Arlington apartment six to ten times in two weeks is the only fact consistent with Grandberry's living there, and it is a weak indication, on its own. That Grandberry also possessed and used a "key to [enter] the residence in question" is, however, potentially of

significance in the probable cause calculus. *See Cuevas*, 531 F.3d at 734; *Howard*, 447 F.3d at 1266.

In analyzing the relevance of a parolee's possession and use of a key, we have made clear that such a fact, standing alone, does not establish probable cause. In *United States v. Harper*, 928 F.2d 894 (9th Cir. 1991), *overruled in part on other grounds*, *King*, 687 F.3d at 1189, for example, the court listed six facts of which the police were aware that, in combination, were "just barely" "sufficient to give the police probable cause to believe that [the defendant] resided" at the residence searched. *Id.* at 896–97. *One* of those facts was that the police observed the defendant enter the residence with a key "once or twice during a three day period." *Id.* at 896. But the police also knew that: (1) the defendant's family leased the home; (2) his brothers lived there; (3) according to an uncorroborated source, the defendant lived there, too; (4) before he had been released from prison, he had lived with his family, "suggesting that he had no independent residence and would resume living with them upon his release"; and (5) the defendant's "known associates" parked their cars at the family's home. *Id.* at 896. *Harper*'s approach to the probable cause analysis reinforces "just how stringent this standard is." *See Howard*, 447 F.3d at 1262.

Here, the Officers saw Grandberry using a key to enter the residence in question more times than in *Harper* (although with about the same frequency, given the period of observation). The number of times Grandberry used the key, however, is of relatively little additional probative value in assessing whether the apartment in question was Grandberry's residence, as compared to the fact that, as in *Harper*, someone entrusted him with a key in the first place. But people other than residents are often entrusted with

access to homes — for example, people performing house-keeping or repair work, or childcare or in-home health services. Here, as the district court noted, key access is as consistent with the apartment's use as the location of a drug business as it is with its being Grandberry's residence.

Grandberry's key access to the Arlington apartment would not, without more, lead a reasonably prudent person to believe that he lived there. And the other factors — especially the considerations that Grandberry was not seen at the Arlington apartment during the Officers' nighttime surveillance, and there was no basis for doubting that Grandberry lived where he had reported he did, on South Manhattan Place — point strongly in the opposite direction. We therefore conclude that under our "relatively stringent" standard, the Officers lacked probable cause to conclude that Grandberry lived at the Arlington apartment that they searched.

**B.**

The government also argues that regardless of whether the Officers had probable cause to believe that Grandberry lived at the Arlington apartment, the search was nonetheless permitted under the provision of Grandberry's search condition authorizing searches of "any property under [his] control." As the government reads the search condition, the search was justified because the Arlington apartment was real "property under [Grandberry's] control," with the control

evidenced by Grandberry's repeated entry to the building with keys.[10]

Assuming, without deciding, that Grandberry exhibited a sufficiently strong connection to the apartment to demonstrate "control" over it, we conclude that an expansive understanding of the "property under your control" condition, if applied to residential locations, cannot coexist with our

---

[10] Grandberry argues that the government forfeited this argument because the prosecutor (1) failed to brief it before the hearing on the motion to suppress; and (2) affirmatively disavowed the argument at that hearing, stating "we're not sure that the 'property under your control' language would actually apply to residences, which is probably why the parties did not frame it like [t]hat." The government soon thereafter, however, disavowed the disavowal, submitting a supplemental brief on the issue. Grandberry, in turn, filed a response, arguing that the government's argument was forfeited because it was raised after the evidentiary hearing, but also responding to the government's motion on the merits, proffering several exhibits in support. The district court acknowledged the supplemental briefs in an order filed the next month, and afforded the government an opportunity to reply to Grandberry's newly introduced evidence; the government did not do so. So in the end, the issue was "'raised sufficiently for the [district] court to rule on it.'" *See Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (quoting *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992)).

But the district court did not address the "property under . . . control" issue in its final suppression order. Whether that was due to an oversight or a conclusion that the issue was not properly raised, we do not know. Although the district court would almost certainly have had the discretion to refuse to entertain an issue first raised after the briefing and hearing on the motion to suppress — and after an express disavowal of the argument in open court — we cannot tell whether that is what the court did. We therefore choose to decide the question — which was fully briefed before us — rather than declaring it forfeited. *See Whittaker*, 953 F.2d at 515 (considering the merits of an issue that the district court had the "opportunity to review," but "declined to").

longstanding probable-cause-as-to-residence requirement. As we are bound by our precedent, we conclude that the "property under your control" provision cannot refer to a place where someone else, but not the parolee, lives.

In *Motley*, the California parolee on whose search condition the officers sought to rely was subject to a similar condition to Grandberry's, authorizing searches of "his person, residence, and any property under his control." 432 F.3d at 1075. (In fact, California has mandated such a search condition for all of its parolees since 1977. *See* Cal. Code Regs. tit. 15, § 2511(b) & history (2012).) In *Cuevas*, the parolee on whose condition the searching officers relied was also a California parolee, *see* 531 F.3d at 730, and therefore subject to the same condition as Grandberry.

Notwithstanding the "any property" provisions applicable in those cases, *Motley* and *Cuevas* stated our probable-cause-as-to-residence rule as a requirement that must be independently satisfied to justify any warrantless search of a house or other residence pursuant to a parole condition:

> [W]e hold that before conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched.

*Motley*, 432 F.3d at 1080.

> [A]bsent such probable cause, '[n]othing in the law justifies the entry into and search of a third person's house to search for the parolee.'

*Cuevas*, 531 F.3d at 732 (quoting *Motley*, 432 F.3d at 1079). Similarly, in *Mayer*, we explained unequivocally that "[b]efore law enforcement officers may conduct a warrantless probation search," even if they have reasonable suspicion of wrongdoing, "they must *also* have probable cause to believe that the probationer actually lives at the residence searched." 560 F.3d at 957 (emphasis added).

Under *Motley*, *Cuevas*, and *Mayer*, the probable-cause-as-to-residence requirement does not admit of the loophole that the government urges.    Confirming the understanding underlying our precedents, we observe that the government has cited *no* case — and we have found none — applying the "property under your control" search condition to a residence. Instead, the fairly large number of cases applying that term uniformly involve searches either of vehicles or of *items* found in a residence. *See, e.g.*, *People v. Schmitz*, 55 Cal. 4th 909, 913, 916 (2012) (search of shoes and bag of chips in the backseat of a car); *People v. Boyd*, 224 Cal. App. 3d 736, 740, 750–51 (1990) (search of handbag inside a trailer)[11]; *People v. Montoya*, 114 Cal. App. 3d 556 (1981) (search of pants pockets found in a living room); *Hernandez v. Super. Ct.*, 110 Cal. App. 3d 355, 365–66 (1980) (search of a vehicle).

---

[11] *Boyd* states in passing that the police in that case "decided to search [a parolee's] residence . . . pursuant to" a search clause "stat[ing] that [his] "property 'and any property under his control can be searched without a warrant.'" 224 Cal. App. 3d at 740.  But the only issue presented in that case was whether once inside a trailer, the officers had a sufficient basis for believing that a handbag belonged to the defendant, a non-parolee. *See id.* at 742.  There was no challenge to the entry into the trailer, and so no occasion to consider whether that entry was in fact authorized by the quoted language.

Moreover, the government's proposed reading of Grandberry's search condition would violate "one of the most basic interpretive canons, that 'a statute [or regulation] should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *See Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)); *In re Estate of Covington*, 450 F.3d 917, 924 (9th Cir. 2006) (applying that interpretive canon to regulations).[12]  Reading "property under . . . control" to include residences would render the separate "your residence" term a nullity.  There would simply have been no reason to include "your residence" in the mandatory condition if residences were covered by "property under your control."[13]

Our limited reading of the "property under . . . control" condition in Grandberry's search condition also conforms to the doctrinal underpinnings of the probable-cause requirement, which implements the "special protection" "accord[ed] . . . to the home" under the Fourth Amendment.

---

[12] As noted, the search condition at issue here is imposed uniformly on California parolees pursuant to a statutory and regulatory scheme.  *See* Cal. Penal Code § 3067(b)(3) (2012); Cal. Code Regs. tit. 15, § 2511(b)(4) (2013).

[13] The California Department of Corrections and Rehabilitations (CDCR)'s own explanation of the condition is consistent with this understanding of the phrase "property . . . under control": "Simply stated, the standard conditions of parole are [that] . . . the parolee, their residence, and *possessions* can be searched at any time of the day or night . . . ."  *See* Cal. Dep't of Corrections & Rehab., *Parolee Conditions*, http://www.cdcr.ca.gov/Parole/Parolee_Conditions/index.html          (last visited Sept. 10, 2013).  *Lopez* suggested the same understanding, summarizing the condition as giving notice that a parole's "person, his property, and his residence were subject to" search.  *See* 474 F.3d at 1213.

*See United States v. Johnson*, 457 U.S. 537, 552 n.13 (1982); *United States v. Duenas*, 691 F.3d 1070, 1080 (9th Cir. 2012) (citing *United States v. Jones*, 132 S. Ct. 945 (2012)). In reaffirming our probable-cause-as-to-residence rule, we explained in *Motley* that "[r]equiring officers to have probable cause to believe that a parolee resides at a particular address prior to conducting a parole search protects the interest of third parties." 432 F.3d at 1080. The building searched here was, by all appearances, a residential apartment building. The Officers' declarations repeatedly describe the Arlington address as an "apartment building," and photographs of the building depict numbered mailboxes each marked with individuals' names (photographs of the building's exterior).[14]  The Officers explained that they searched the apartment on the understanding that Grandberry *lived* there, not on some other basis. Were we to permit a search of the apartment in violation of the *Motley* "requirement, we [would] risk diminishing the Fourth Amendment protections owed to the [actual] homeowner." *Id.* at 1079. As "[t]he Fourth Amendment's protection against unreasonable searches in a person's home is not diminished by the mere presence of a guest," *see id.* (internal quotation marks omitted), the government's proposed reading of the search condition threatens to eviscerate the privacy interests of non-parolees in the home, where Fourth Amendment rights are "sacrosanct," *see Duenas*, 691 F.3d at 1080.

---

[14] For these reasons, this case does not present the question whether the search of non-residential real "property" "under" a parolee's "control," such as a storefront or warehouse, could be justified under the terms of this search condition.

We conclude that where, as here, it is abundantly clear that the searched property is a residence, a parole condition permitting searches of "your residence and any property under your control" is triggered only when the officers have probable cause that the parolee *lives* at a residence.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of Grandberry's motion to suppress, and remand for further proceedings.

**AFFIRMED.**

WATFORD, Circuit Judge, concurring:

Do parolees have a greater expectation of privacy in someone else's home than they have in their own home? I can't think of any reason why they should. Yet that is the rule we established in *United States v. Howard*, 447 F.3d 1257 (9th Cir. 2006), which we, as a three-judge panel, are bound to follow here. For the reasons the court explains, faithful application of *Howard* requires us to affirm the district court's suppression ruling. But, like the district court, I think that decision is unsound and warrants reexamination.

Although once open to debate, it's now settled that a criminal defendant may seek suppression of evidence discovered during an illegal search only if the defendant's *own* Fourth Amendment rights were violated. *Rawlings v. Kentucky*, 448 U.S. 98, 104–06 (1980); *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). A defendant may not

vicariously assert the Fourth Amendment rights of others. *Alderman v. United States*, 394 U.S. 165, 174 (1969). Thus, the Supreme Court has held, a defendant generally cannot seek suppression of evidence discovered during an illegal search of an acquaintance's purse, or of a friend's car in which the defendant is merely a passenger. *Rawlings*, 448 U.S. at 106; *Rakas*, 439 U.S. at 148–49.

Had the warrantless search at issue here occurred at Mr. Grandberry's own home, he would not have been able to seek suppression of the evidence. As a parolee subject to California's standard condition authorizing warrantless, suspicionless searches of his residence, Mr. Grandberry has no legitimate expectation of privacy in his own home. *See United States v. Lopez*, 474 F.3d 1208, 1213 (9th Cir. 2007), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc). That's true notwithstanding the fact that, among the places protected by the Fourth Amendment, "the home is first among equals." *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013). Nowhere is an individual's claim to a legitimate expectation of privacy stronger than in her own home. *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27, 31, 37 (2001). So, one might ask, if a parolee's expectation of privacy in his own home is nil, how could he have an expectation of privacy in someone else's home?

The only answer I've heard is that *Minnesota v. Olson*, 495 U.S. 91 (1990), supposedly so provides. There the Supreme Court held that an overnight guest has a legitimate expectation of privacy in her host's home. *Id.* at 96–97. But that case does not help parolees who are overnight guests in someone else's home. As the Fifth Circuit has explained, "*Olson* simply extends to the houseguest the Fourth

Amendment rights he would have in his own home." *United States v. Taylor*, 482 F.3d 315, 318 (5th Cir. 2007). Since parolees subject to California's warrantless search condition have no Fourth Amendment rights in their own homes, they have no legitimate expectation of privacy they can take with them to anyone else's home. *See id.* at 319.

That does not mean, of course, that the *host's* Fourth Amendment rights are in any way diminished. If the police conduct a warrantless search of the host's home, on the unsupported belief that the parolee resides there, the *host's* Fourth Amendment rights are undoubtedly violated. The host could seek suppression of any evidence the government tried to use against him in a subsequent criminal prosecution, and could pursue a civil action against the offending officers under 42 U.S.C. § 1983 or state tort law. *See Motley v. Parks*, 432 F.3d 1072 (9th Cir. 2005) (en banc), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc). But the parolee cannot seek suppression of evidence discovered during an illegal search of the host's home, because the parolee's *own* Fourth Amendment rights were not violated. *Taylor*, 482 F.3d at 319; *see Rakas*, 439 U.S. at 134.

The principle that a defendant can't assert greater Fourth Amendment rights in someone else's home than she has in her own home has been around for some time. In fact, we held exactly that while sitting en banc thirty years ago: "A person has no greater right of privacy in another's home than in his own." *United States v. Underwood*, 717 F.2d 482, 484 (9th Cir. 1983) (en banc); *see also United States v. Buckner*, 717 F.2d 297, 300 (6th Cir. 1983) ("It would be illogical to afford the defendant any greater protection in the home of a third party than he was entitled to in his own home."). To be

sure, the context there was different. Like the Sixth Circuit in *Buckner*, we were explaining why, under *Payton v. New York*, 445 U.S. 573 (1980), and *Steagald v. United States*, 451 U.S. 204 (1981), a defendant's own Fourth Amendment rights were not violated when the police entered a third party's home without a search warrant to arrest the defendant. The defendant could not seek suppression of evidence discovered in the third party's home, we held, because the police had a warrant for the defendant's arrest and thus, under *Payton*, could have entered the defendant's own home without a search warrant to arrest him there. *Underwood*, 717 F.2d at 483–84. Despite the difference in context, I see no reason why the principle established in *Underwood* should not apply with equal force to defendants whose homes are subject to warrantless, suspicionless searches by virtue of their status as parolees.

The only other observation I would add is the one Judge Noonan made in his concurrence in *Howard*. He rightly observed that the effect of our holding in that case is to give parolees who've decided to re-offend a "safe house" for storing contraband and conducting illicit activities. *Howard*, 447 F.3d at 1269 (Noonan, J., concurring, dubitante). This case is a perfect illustration of that phenomenon: Mr. Grandberry, intent on resuming his drug-trafficking activities, set up shop in his girlfriend's apartment and stored his drugs and firearm there. After all, if you're on parole, why take a chance stashing contraband at your own residence when you can easily do so at someone else's, safe from warrantless police searches so long as you occasionally stay there overnight? Allowing parolees to establish these sorts of safe houses surely frustrates the State's legitimate interest in supervising parolees to reduce recidivism, protect public

safety, and promote reintegration into productive society. *See Samson v. California*, 547 U.S. 843, 853–54, 856 n.4 (2006).

In short, *Howard* is a decision ripe for reconsideration. We engaged in no Fourth Amendment analysis there to support the rule we adopted; in fact, we did not so much as cite *Minnesota v. Olson*, 495 U.S. 91 (1990), the only Supreme Court decision on which our rule could have been grounded. *See Howard*, 447 F.3d at 1262. In addition, we decided that case before the Supreme Court decided *Samson*, which clarified that parolees have "severely diminished expectations of privacy by virtue of their status alone," and that the State has "substantial" interests in subjecting parolees to "privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." *Samson*, 547 U.S. at 852, 853. If we're going to adhere to the rule we adopted in *Howard*, we should do so after squarely confronting and resolving the doctrinal inconsistencies that rule seems to create.

BERZON, Circuit Judge, concurring:

I write separately to respond to Judge Watford's suggestion that applying *United States v. Howard*, 447 F.3d 1257 (9th Cir. 2006), here permits a parolee to assert greater Fourth Amendment protection in someone else's home than in his own and is "unsound and warrants reexamination." Conc. at 29.

In my view, our outcome is compelled not solely by *Howard*, but also by the text of Grandberry's parole search conditions, which allow suspicionless searches of *only* the

parolee's person, his residence, and property under his control.  There is no provision permitting parole searches of other people's houses in which a parolee is an overnight visitor but where he does not reside.  Thus, to the degree Grandberry has more substantive protection with regard to searches of his surroundings — but not of his person, assuming proper entry — in other people's houses, that difference stems largely from California law, as do the "doctrinal inconsistencies," *id.* at 33, that trouble Judge Watford.

California may have good reason to tie its own hands with regard to parole searches.  The State has an interest protecting the privacy of its law-abiding citizens from intrusion on the basis of simple association with a parolee.  To allow suspicionless searches of any residence in which a parolee is found threatens the privacy of family, friends, and others who advance the State's interest in "reintegrati[ng] parolees into productive society." *Samson v. California*, 547 U.S. 843, 854 (2006).  Just as a "cooperative occupant's invitation adds nothing to . . . counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place," *Georgia v. Randolph*, 547 U.S. 103, 115 (2006), California has chosen not to allow the diminished privacy interest of one individual to undermine that of another.

Judge Watford suggests that this third-party substantive interest can be accommodated by allowing a non-parolee whose home is searched to have standing to sue (or to invoke the exclusionary rule if prosecuted).  This approach would run into a second line of authority, that derived from *Minnesota v. Olson*, 495 U.S. 91 (1990), which provides an

ordinary overnight guest sufficient privacy interest in a residence to establish Fourth Amendment standing.

*Olson* recognized that a guest has a lesser privacy interest in a home in which he is a guest than in his own home, *id.* at 99, because the host has ultimate control over the residence, including who may enter it and whether the guest may stay. Nonetheless, *Olson* held an overnight guest's privacy interest strong enough to give rise to Fourth Amendment standing, because

> [t]he host may admit or exclude from the house as he prefers, but it is unlikely that he will admit someone who wants to see or meet with the guest over the objection of the guest. . . .The point is that hosts will more likely than not respect the privacy interests of their guests, who are entitled to a legitimate expectation of privacy despite the fact that they have no legal interest in the premises and do not have the legal authority to determine who may or may not enter the household.

*Id.* The parole conditions required in California and imposed on Grandberry do not undermine the limited privacy expectation on which *Olson* rests, precisely because they apply only to Grandberry's person, residence, and the property he controls.

There is simply no precedent for precluding an individual from challenging a search in a location in which the search is indeed unconstitutional as to the resident, *and* the individual would have standing under *Olson*, *and* there is no condition or circumstance limiting his privacy interest *as to that*

*location*.  In short, if there is an anomaly here, it is *Olson*, and not our precedent.  And, of course, we are obliged to follow *Olson*.